

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-12-2003

# USA v. Merlino

Precedential or Non-Precedential: Precedential

Docket No. 01-4374

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Merlino" (2003). *2003 Decisions.* Paper 84.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/84

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed November 12, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 01-4374

———————

UNITED STATES OF AMERICA

v.

JOSEPH MERLINO
a/k/a
SKINNY JOEY

Joseph Merlino,
                    Appellant

———————

No. 01-4375

———————

UNITED STATES OF AMERICA

v.

STEVEN MAZZONE,
                    Appellant

———————

No. 01-4392

———————

UNITED STATES OF AMERICA

v.

FRANK GAMBINO,
                    Appellant

No. 01-4394

UNITED STATES OF AMERICA

v.

MARTIN ANGELINA,

No. 01-4436

UNITED STATES OF AMERICA

v.

JOHN CIANCAGLINI,
Appellant

No. 01-4441

UNITED STATES OF AMERICA

v.

ANGELO LUTZ,
Appellant

No. 01-4453

UNITED STATES OF AMERICA

v.

GEORGE BORGESI,
Appellant

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Crim. Nos. 99-cr-00363-1, 99-cr-00363-6,
99-cr-00363-2, 99-cr-00363-8, 99-cr-00363-9,
99-cr-00363-10, and 99-cr-00363-7
District Judge: The Honorable Herbert J. Hutton

———————

Argued: June 2, 2003

Before: BARRY, FUENTES, and ROSENN, *Circuit Judges*

(Opinion Filed: November 12, 2003)

———————

Edwin J. Jacobs, Jr., Esq.
Joseph A. Levin, Esq.
Jacobs & Barbone
1125 Pacific Avenue
Atlantic City, NJ 08401

*Attorneys for Appellant*
*Joseph Merlino*

Stephen P. Patrizio, Esq. (Argued)
Dranoff & Patrizio
117 South 17th Street
Architects Building, Suite 1600
Philadelphia, PA 19103

*Attorney for Appellant*
*Steven Mazzone*

John J. Fioravanti, Jr., Esq.
Fioravanti & Knight
93 East Court Street
Doylestown, PA 18901

*Attorney for Appellant*
*Frank Gambino*

Jack J. McMahon, Jr., Esq.
Suite 900
1500 Walnut Street
Philadelphia, PA 19102

*Attorney for Appellant*
*Martin Angelina*

F. Emmett Fitzpatrick, Jr., Esq.
 (Argued)
F. Emmett Fitzpatrick Law Offices
6th & Chesnut Streets
926 Public Ledger Building
Philadelphia, PA 19106

*Attorney for Appellant*
*John Ciancaglini*

Christopher D. Warren, Esq.
 (Argued)
1604 Locust Street
Philadelphia, PA 19103

*Attorney for Appellant*
*Angelo Lutz*

Peter Goldberger, Esq. (Argued)
Law Office of Peter Goldberger
50 Rittenhouse Place
Ardmore, PA 19003-2276

*Attorney for Appellant*
*George Borgesi*

David E. Fritchey, Esq. (Argued)
Barry Gross, Esq.
Zane D. Memeger, Esq.
Steven D'Aguanno, Esq.
Assistant U.S. Attorney
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*Attorneys for Appellee*

---

## OPINION OF THE COURT

---

BARRY, *Circuit Judge*:

## I. *INTRODUCTION*

Beginning in June of 1999, a federal grand jury in the Eastern District of Pennsylvania returned a series of indictments culminating in January 2001 in the thirty-six count fourth superceding indictment on which the seven defendants who had not already pled guilty went to trial in March of 2001. In broad summary, the defendants were charged with Racketeer Influenced and Corrupt Organization (RICO) conspiracy and a RICO substantive count, with the Philadelphia La Cosa Nostra ("LCN") family alleged to be "The Enterprise." Murder and conspiracy to murder, violent crime in aid of racketeering, extortion and conspiracy to extort, the operation of illegal sports bookmaking businesses, and thefts of goods in interstate commerce were among the thirty-six racketeering acts and thirty-six counts charged.

On July 20, 2001, four months to the day on which trial commenced, all of the seven defendants were convicted of at least some of the charged offenses, including RICO and RICO conspiracy. However, all of the charges, be they racketeering acts or substantive counts, alleging anything to do with murder or violent crimes in aid of racketeering and many of the numerous extortion racketeering acts and counts were found by the jury to be wanting and resulted in findings of "not proven" or acquittals. The government, and there is no way to sugar-coat it, lost the heart of its case.

In December of 2001, the seven defendants were sentenced to terms of imprisonment ranging from 71 months to 168 months. They now appeal, raising pre-trial, trial, and sentencing issues that, because of the permutations and combinations specific to each of the defendants, total approximately thirty.

We will not address each of the issues raised but, rather, will focus on those issues which we believe particularly warrant discussion. Suffice it to say, however, that whether addressed or unaddressed, we have carefully considered each issue and, aside from one count and a sentencing enhancement as to one defendant, we will affirm the judgments of conviction and sentence.

## II.

We begin with some brief procedural background. Joseph Merlino was the sole defendant named on June 30, 1999 in the initial two count indictment that charged him with drug offenses. On December 15, 1999, the first superceding indictment was returned, adding Frank Gambino, Ralph Abbruzzi, Steven Frangipani, and Anthony Accardo as defendants, and expanding the charges against Merlino. The second superceding indictment, returned on March 30, 2000, substantially expanded the charges to approximately what they were when trial commenced, and added as defendants Steven Mazzone, George Borgesi, Martin Angelina, John Ciancaglini, Angelo Lutz, and Stephen Sharkey. The third superceding indictment, returned on October 11, 2000, made only minor changes, and the fourth superceding indictment, returned on January 24, 2001, essentially only deleted defendants Abbruzzi and Frangipani, who had earlier pled guilty to one count. The fourth superceding indictment, which hereinafter we will refer to as "the indictment," thus named nine defendants. Defendants Accardo and Sharkey entered pleas of guilty shortly before trial, also to one count, and trial commenced on March 20, 2001 against the remaining seven defendants, Messrs. Merlino, Mazzone, Gambino, Angelina, Ciancaglini, Lutz and Borgesi.

The 111 page indictment identifies defendants Merlino, Mazzone, Borgesi, Angelina, Ciancaglini, and Gambino as "made" members of the Philadelphia LCN family — "The Enterprise" — and Lutz and the four defendants who pled guilty as "associates" in the family, a family, it was alleged, that has been in "substantially continuous operation for a number of decades." The structure, hierarchy, and manner in which the enterprise operated was set forth in the

indictment in detail that would be familiar to any viewer of "The Sopranos" or "The Godfather," including the priority of the sons of "made" members, the ritual initiation ceremonies, and the penalty of death for violating the "Code of Silence" — "Omerta" — with nicknames of co-conspirators such as "Horsehead," "Snitch," and "Pete the Crumb" sprinkled throughout. The indictment described defendant Merlino as having risen through the ranks to be Acting Boss, defendant Mazzone to be Acting Underboss, and defendant Borgesi to be Acting Consigliere.

The thrust of the indictment, and there can be no mistake about it, was violence, be it actual, threatened, or otherwise intended. Count One, the RICO conspiracy count, listed, as noted, thirty-six racketeering acts ("RA's"). The first five, together with RA8, charged defendants Mazzone, Borgesi, Angelina, Ciancaglini, and Gambino with one or more of the following: conspiracy to murder John Stanfa; attempted murder of John Ciancaglini, Jr.; murder and conspiracy to murder William Veasey; murder and conspiracy to murder Joseph Sodano; murder and conspiracy to murder Anthony Turra; and the attempted murder of Anthony Milicia. Defendant Merlino was charged in all of these racketeering acts. Thereafter, the indictment listed racketeering acts alleging extortion — conspiracy to extort "street tax" and protection money (RA6); extortion of Anthony Milicia and Louis Procaccini (RA7); Hobbs Act extortion and extortion of a bookmaking business under Pennsylvania law (RA's 9-24); and extortionate collection of credit and conspiracy to collect an extortionate collection of credit (RA28). Bringing up the rear, so to speak, were allegations of illegal sports bookmaking (RA's 25-27); receipt, possession, and sale of a stolen Lamborghini (RA29); receipt of, respectively, stolen Sony TV sets, electric ceiling fans, women's sweatsuits, baby formula, and bicycles (RA's 30-34); and, as against Merlino, the conspiracy to distribute cocaine and use of a communication facility to further that conspiracy charged in the initial indictment (RA's 35-36). Count Two charged a RICO substantive offense, and the remaining thirty-four counts of the indictment largely tracked the racketeering acts described above. We will, of course, parse the counts as necessary to do so in the discussion which follows.

Given what was charged, and the strong emphasis at trial on the violent offenses (including the promised or feared violence by which extortion can, of course, be defined), it was not an overstatement to say, as we said at the outset, that, for whatever reason, the government lost "the heart of its case." Thus, Merlino was convicted only of Counts One and Two (the RICO conspiracy and RICO substantive counts, respectively), Count Three (collection of an unlawful debt), Count Twenty-Three (illegal gambling business); Counts Thirty, Thirty-Two, and Thirty-Three (receipt of stolen ceiling fans, baby formula, and bicycles); and Count Thirty-Four (conspiracy to receive stolen goods). The only racketeering acts found "proven" as to him were RA6 (conspiracy to extort "street tax" and protection money); RA25 (illegal sports bookmaking); and RA's 31-34 (receipt of the stolen fans, sweat suits, baby formula, and bicycles). Stated somewhat differently, as to defendant Merlino, the jury found "not proven" all of the RA's alleging murder, conspiracy to murder, attempted murder, and extortion, and acquitted on all of the concomitant substantive counts with which he was charged.

Each of the other defendants was also convicted on Counts One and Two. Defendant Mazzone was found guilty as well of Count Twenty-Four (illegal sports bookmaking), and only RA6 (conspiracy to extort "street tax" and protection money), RA7 (extortion of Anthony Milicia and Louis Procaccini) and RA26 (illegal sports bookmaking) were found to be "proven." Defendant Borgesi did not fare quite as well, being convicted also of Counts Three and Four (collection of an unlawful debt); Counts Sixteen, Twenty, and Twenty-Two (Hobbs Act extortion), although he was acquitted of the bulk of the extortion counts; and Counts Twenty-Three, Twenty-Four, and Twenty-Five (illegal sports bookmaking). The jury also found that RA6 (conspiracy to extort), RA's 18, 20, 21, 22, and 24 (extortion), and RA's 25, 26, and 27 (illegal sports bookmaking) were "proven."

Angelina was also found guilty of Count Eight (Hobbs Acts conspiracy), Nine through Thirteen (Hobbs Act extortion), Twenty-Four (illegal sports bookmaking) and Twenty-Eight (receipt, possession, and sale of the stolen

Lamborghini). The jury found only RA6 (conspiracy to extort), RA's 9-15 (extortion), and RA26 (illegal sports bookmaking) "proven." In addition to Counts One and Two, Ciancaglini was found guilty of Counts Eight and Twenty-Four and RA's 6, 9, and 26 were found "proven." While Gambino was also convicted of Counts One and Two, he was, aside from those counts, only found guilty of receipt of the stolen Sony TV's, sweat suits, baby formula, and bicycles, and only the RA's pertaining to those stolen goods were found "proven." Finally, in addition to Counts One and Two, Lutz was convicted of Counts Three and Four (collection of an unlawful debt); Sixteen, Twenty, and Twenty-Two (Hobbs Act extortion) and Twenty-Three and Twenty-Five (illegal sports bookmaking). RA6 (conspiracy to extort); RA's 18, 20, 21, 22, and 24 (extortion); and RA's 25 and 27 (illegal sports bookmaking) were "proven."

In December of 2001, the District Court imposed sentence on the seven defendants convicted following trial. As relevant here (because no defendant challenges any fine imposed or any term of supervised release), defendants Merlino and Borgesi were sentenced to terms of imprisonment of 168 months; defendants Mazzone, Ciancaglini and Lutz were sentenced to 108 months; and defendants Gambino and Angelina were sentenced to 71 months. They now appeal. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## III.

We recognize that the jury's verdict has dramatically narrowed the potential issues on appeal and, thus, has simplified our task that, nonetheless, remains difficult. As we noted at the outset, we have carefully considered the numerous issues which are presented to us and now proceed to explain why, with two exceptions, those we do discuss are unavailing.[1]

---

1. In addition to those issues we will discuss, the following issues have been raised by the various defendants and found by us to lack merit: (1) Angelina's claim of insufficient evidence to support the verdict of guilty on Counts Nine-Thirteen; (2) Borgesi's claim that the District Court erred

## A.  Disqualification of Morris W. Pinsky, Esq.

For reasons we will discuss, the District Court granted the government's motion to disqualify Morris W. Pinsky, Esq., defendant Borgesi's "lawyer of many years and first choice for trial." We note that at the outset, albeit somewhat parenthetically, that at all times during the extensive pretrial proceedings and during trial itself, Borgesi was represented by *two* extraordinarily able attorneys, both of whom he retained. Thus, on April 4, 2000, just days after Borgesi was indicted, Mr. Pinsky entered his appearance, and a mere two days later, Bruce Cutler, Esq., also did so. Mr. Cutler remained in the case

in using the Sentencing Guideline for extortion by force; (3) Ciancaglini's claims that the evidence was insufficient as to Counts One, Two, Eight, and Twenty-Four and RA's 9A, 9B, and 26; RA6 is duplicitous of RA's 9A and 9B and should merge with them; the District Court erred in allowing "other crimes" evidence of his efforts to take over Hamilton's video poker machine business; erred when it declined to give two jury instructions; erred in grouping his convictions; erred in enhancing his sentence based on the amount extorted, obstructing justice, playing an aggravating role and making threats of death, bodily injury, and kidnapping; and erred in declining to credit his "minimal" role; (4) Gambino's claim that the District Court erred in enhancing his sentence by three levels for having a management or supervisory role in the offense, and by four levels for being in the business of receiving and selling stolen property; (5) Lutz's claims that the District Court erred when it refused to instruct the jury that a defendant could not be convicted of extortion absent evidence calculated to exploit the LCN's violent reputation, and that there was insufficient evidence in that regard, and when it enhanced his sentence for making threats of death, bodily injury, or kidnapping; (6) Mazzone's claims that the evidence was insufficient to support the verdict of guilty on Counts One, Two, and Twenty-Four, and RA's 6, 7, and 26, and that the District Court erred at sentencing in separating the three counts of conviction into "three groups of closely related counts," in calculating the loss amount, and in enhancing his sentence for aggravating role; (7) Merlino's claims that the District Court erred in excluding, under Fed.R.Evid. 608(b), the testimony of witnesses who would have impeached government witness Previte, in calculating the base offense level for bookmaking and collection of an unlawful debt, in adopting the findings of Presentence Investigation Report without resolving his objections, and in enhancing his sentence for aggravating role and amount of loss.

from the beginning until the end, joined by Louis M. Natale, Esq., after Mr. Pinsky was disqualified. Thus, as we address the issue of Mr. Pinsky's disqualification, we are not confronted with a situation in which Borgesi was left bereft of counsel, or even bereft of counsel of his choice, because Messrs. Cutler and Natale were surely chosen by him.

We review the District Court's order granting the government's motion to disqualify Mr. Pinsky in two stages. "First, we exercise plenary review to determine whether the district court's disqualification was arbitrary — 'the product of a failure to balance proper considerations of judicial administration against the right to counsel.' If we find that the district court's decision was not arbitrary, we then determine whether the court abused its discretion in disqualifying the attorney[.]" *United States v. Stewart*, 185 F.3d 112, 120 (3d Cir. 1999) (quoting *United States v. Voigt*, 89 F.3d 1050, 1074 (3d Cir. 1996)).

Because the District Court "engaged in the balancing required by the Sixth Amendment and developed the record necessary to do so," its decision was not arbitrary. *Voigt*, 89 F.3d at 1074. The disqualification issue was fully briefed; documentary evidence, including at least one affidavit, was submitted and the parties did not seek to submit more, content to rely on their written submissions that were supported by exhibits; the District Court heard oral argument; and the Court issued a written Memorandum and Order. Indeed, Borgesi does not waste much time arguing that the disqualification itself and the procedures that brought it about were "arbitrary."

The question for us, then, is whether the District Court's ultimate conclusion to disqualify Mr. Pinsky constituted an abuse of discretion. A criminal defendant's Sixth Amendment right to counsel of one's choice is not absolute; "where 'considerations of judicial administration' supervene, the presumption in favor of counsel of choice is rebutted and the right must give way." *Id.* (quoting *Fuller v. Diesslin*, 868 F.2d 604, 607 & n.3 (3d Cir. 1989)). Here, of course, given the participation of Messrs. Cutler and Natale, Borgesi was never without "counsel of [his] choice," but only without counsel of what he describes as his "first choice." That, of course, was because Mr. Pinsky was

disqualified for two reasons: (1) his communication with potential government witness Gaetano Scafidi on Borgesi's behalf at the Bucks County Correctional Facility on March 14, 2000, and (2) his brief representation of mob boss-turned-government witness Ralph Natale during a police interview in the early 1970s.

Borgesi argues that the first ground did not require disqualification, and that the "second was based upon a clearly erroneous finding of fact and imposed disqualification when that was not the least intrusive measure available to deal with the attenuated conflict that the lower court identified." The government responds that the District Court's decision was justified for the reasons noted above, *i.e.*, Mr. Pinsky's improper pre-indictment effort to induce and persuade a represented witness not to testify against Borgesi or otherwise cooperate with the government, exposing Pinsky to possible criminal and/or disciplinary sanctions and making him a potential witness regarding a material matter, and his prior representation of government witness Natale concerned a murder and other matters that were destined to become subjects of cross-examination at trial. We need only address the first reason because we find that reason, in and of itself, to be sufficient.

In the Spring of 2000, facing release from jail and believing that those in the LCN family loyal to defendant Merlino intended to kill him should he return to Philadelphia, Gaetano Scafidi contacted the government and agreed to become a cooperating witness. He was then transferred from federal prison to the Bucks County jail in advance of his grand jury appearance.

When Borgesi learned of Scafidi's transfer, he tried unsuccessfully to find out if Scafidi was cooperating. On March 14, 2000, at Borgesi's behest, Mr. Pinsky visited Scafidi in prison. Mr. Pinsky "smuggled," the government says, a five-page letter from Borgesi into the prison for Scafidi to read; aside from one letter a week earlier, this was the first contact between Borgesi, who was loyal to Merlino, and Scafidi, who had defected from Merlino's faction, in over six years. The letter attempted to disabuse Scafidi of any notion that there was a plan to kill him and

assured him that it would be safe for him to return to Philadelphia upon his release. Mr. Pinsky reinforced this message, telling Scafidi that Borgesi liked him and felt badly for him. Mr. Pinsky also told Scafidi that Borgesi's uncle, Joseph Ligambi, who was then the acting boss of the Philadelphia LCN, "had scruples and said hello." Finally, Mr. Pinsky offered Scafidi $100 from Borgesi for his commissary account, which Scafidi declined. On March 17, 2000, Borgesi sent a check for $150 to Scafidi's commissary account, a check which Scafidi did not cash.

As the government puts it, "Scafidi saw Pinsky's visit and the communications from Borgesi as a treacherous mixture of covert threats, deceitful efforts to lull him into a false sense of security . . . and clumsy attempts to buy him off." The District Court found that "Pinsky's conduct suggests that Pinsky tried to influence either Scafidi's testimony before the grand jury or Scafidi's decision to cooperate with the federal authorities." The District Court viewed this as raising the potential for a conflict of interest, which, where serious, "is a consideration of judicial administration that can outweigh a defendant's right to counsel of choice." *Voigt*, 89 F.3d at 1050.

Mr. Pinsky's attempt to influence Scafidi, if that is what it was, raised the potential of a conflict for two reasons. First, there was a potential for conflict between Mr. Pinsky's personal interest in avoiding an accusation of professional or criminal misconduct and his duty to vigorously defend Borgesi. An attorney who faces criminal or disciplinary charges for his or her actions in a case will not be able to pursue the client's interests free from concern for his or her own. As even Borgesi was forced to concede, the District Court's finding that Mr. Pinsky's conduct suggested an attempt to influence Scafidi was "a suggestion of potential criminal liability." *See also United States v. Grieg*, 967 F.2d 1018, 1022-1023 (5th Cir. 1992)(holding that an attorney who attempted to persuade his client's co-conspirator not to cooperate with the government without informing the co-conspirator's counsel had an actual conflict of interest arising from his own unethical and possibly criminal behavior and should have been disqualified). Mr. Pinsky may also have violated Rule 3.4 of the Pennsylvania Rules

of Professional Conduct, which provides that a lawyer shall not "request a person other than a client to refrain from voluntarily giving relevant information to another party" except under circumstances not present here.[2]

The fact that the meeting at the prison could have led to Mr. Pinsky being called as a witness was a second source of potential conflict, as it is often impermissible for an attorney to be both an advocate and a witness. *See* Pa. R.P.C. 3.7 (a). The government introduced evidence at trial of Mr. Pinsky's visit to show Borgesi's consciousness of guilt. Had Borgesi wished to challenge that evidence, he could have done so only by calling Mr. Pinsky as a witness, and if Pinsky had remained as his attorney, an actual conflict of interest would have existed. We note, as well, that disqualification may also be appropriate where it is based solely on a lawyer's personal knowledge of events likely to be presented at trial, even if the lawyer is unlikely to be called as a witness. *See United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993). The fact that Mr. Pinsky informed Scafidi that Borgesi's uncle, Joseph Ligambi, had become the boss, that the LCN did not intend to kill Scafidi, and that it was safe for Scafidi to return to Philadelphia, put Pinsky in a compromised position given that Borgesi employed a "mob denial" defense at trial.[3]

---

2. Pennsylvania Rule of Professional Conduct 4.2 prohibits lawyers from communicating with a party they know to be represented without the consent of the party's lawyer. Borgesi argues, and the government appears to concede, that Mr. Pinsky did not violate Rule 4.2 in communicating with Scafidi because, while Scafidi was represented by counsel, he was not a party to any proceeding in which Borgesi was involved. Borgesi also argues that Pinsky did not violate Rule 4.3, which states that "[d]uring the course of a lawyer's representation of a client, a lawyer shall not give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client," because Pinsky did not provide Scafidi with legal advice.

3. Borgesi argues that any potential conflict arising out of Pinsky's visit with Scafidi was waivable, and that the District Court failed to give adequate weight to Borgesi's desire to waive that conflict. Borgesi also suggests that the District Court may have mistakenly believed that the

We conclude that Mr. Pinsky's visit to Scafidi was reason enough for his disqualification. We, therefore, need not discuss the government's alternative reason, namely that Mr. Pinsky should have been disqualified because he represented government witness Ralph Natale when Natale was interviewed regarding the December 25, 1973 murder of Joseph McGreal. We note, however, that McGreal's murder was a subject of testimony at trial, and that Mr. Pinsky's representation of Natale, had Pinsky remained in this case, would surely have not gone unnoticed.

**B.**

### Nondisclosure of Taped Telephone Conversations

All of the defendants argue that the District Court erred in failing to order the government to turn over audio tapes of the telephone conversations of certain cooperating government witnesses maintained by the federal Bureau of Prisons ("BOP"), and that turnover should have occurred either pre-trial or following the testimony of each of the particular witnesses at trial.

Cooperating government witnesses Peter Caprio, Ralph Natale, and Gaetano Scafidi were incarcerated in the prisoner component of the Witness Security Unit of the

---

conflicts at issue could not be waived. First, while Borgesi correctly notes that the Court did not reference Borgesi's Sixth Amendment right in the context of its discussion of waiver, a fair reading of the decision as a whole reveals that the Court was aware of that right but found that it was outweighed by the Court's "institutional interest in protecting the truth-seeking function of the proceedings."

Second, it is not surprising that the District Court used the word "unwaivable" at one point in its opinion given that that word was used in the caption of the government's motion. That aside, it is clear that the Court believed not that there could not be a waiver, but that a waiver would not cure the problems caused by Pinsky's potential conflict or conflicts; indeed, earlier in the opinion, the Court stated that it "may" disqualify counsel upon a showing of a serious potential for conflict. A court need not accept a client's waiver of the conflict, not only with respect to an actual conflict of interest that is obvious before trial, but also in the more common situation of a potential conflict. *Wheat v. United States*, 486 U.S. 153, 163 (1988).

BOP, with each held in a different Witness Security Unit. On January 12, 2000, defendant Merlino asked the government to preserve, as possible Jencks Act material, all telephone conversations of Natale that had been tape-recorded by the BOP. The government, in a move which started the proverbial ball rolling, and which most assuredly it later came to regret, filed a motion to effectuate Merlino's request, a motion the District Court granted on February 15, 2000. The government then served the BOP with two subpoenas directing it to preserve and make copies of all existing recorded conversations of Natale. On May 23, 2000, defendant Gambino asked the government to preserve all tapes of telephone calls made by Caprio, Scafidi, and two others whom Gambino mistakenly believed were in BOP custody. In response, the government served the BOP with a series of subpoenas requesting that the BOP copy and preserve all existing tape-recorded conversations of Scafidi and Caprio.

Subsequently, the BOP forwarded to the government roughly 300 tapes of calls which Natale made between October 11 and December 16, 1999, calls that the government then reviewed and analyzed. Three calls consisted of conversations with Daniel D'Ambrosia, an associate of Natale's whom Natale was encouraging to cooperate with the government; the remainder were to members of Natale's family. The government concluded that none of the tapes contained material that it was required to turn over under *Brady v. Maryland*, 373 U.S. 83 (1963). Nevertheless, as it explained in its brief to us, "because some of the 300 non-D'Ambrosia calls reviewed and analyzed by the government contained disparaging remarks by Natale about the defendants and their lawyers, Natale's expressed hope for leniency at sentencing, and remarks about Natale's relationship with D'Ambrosia . . . the government decided to provide the defense with the D'Ambrosia conversations and 46 excerpts from the 300 conversations that contained such remarks."

On December 14, 2000, a member of the prosecution team received a box that purportedly contained BOP tape recordings of Scafidi's telephone calls. The box was addressed to Michael E. Kunz, Clerk of Court, United

States District Court for the Eastern District of Pennsylvania, but was delivered instead to the United States Attorney's Office and opened by mail room personnel. The prosecution team returned the box to the BOP without reviewing, copying, or inventorying the contents, and advised the BOP to preserve the tapes consistent with the February 15, 2000 order and not send them to Philadelphia.

On February 12, 2001, the government filed a motion to vacate the February 15, 2000 order requiring the preservation of the tapes. BOP records established that between December 17, 1999 and January 9, 2001, Natale made 1,379 calls, Scafidi made 442 calls, and Caprio made 464 calls. These calls had been preserved but were never produced to, or listened to by, any member of the prosecution team.

On March 13, 2001, the District Court held a hearing that addressed, in part, the question of whether the government had any obligation under either *Brady* or the Jencks Act to retrieve, review, or disclose the 2,285 Caprio, Natale and Scafidi tapes that were not then in the physical possession of the prosecution. The Court gave the parties until March 16, 2001 to make any supplemental submissions. On March 15, 2001, the defense responded to the government's motion and moved for issuance of a Rule 17(c) subpoena for the tapes. On March 19, 2001, the District Court issued an opinion ruling that the defense had failed to satisfy its burden of demonstrating that the BOP tapes contained *Brady* material and declining to authorize a Rule 17(c) subpoena on the grounds that (1) it was premature because impeachment material lacks evidentiary value prior to trial, and (2) it was no more than a "fishing expedition."

The District Court found that the government requested at least the initial tapes at issue solely in response to defense requests and not for any criminal investigation or prosecution purpose. This does not mean, of course, that had the tapes contained *Brady* material, the defendants would not have had a right to them; indeed, *Brady* places an affirmative obligation on prosecutors "to learn of any favorable evidence known to the others acting on the

government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). That said, *Kyles* cannot "be read as imposing a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue." *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996). *See also United States v. Locascio*, 6 F.3d 924, 949-950 (2nd Cir. 1993)(refusing to infer knowledge on the part of prosecutors simply because other government agents not on the prosecution team knew something).

As we explained in *United States v. Joseph*, 996 F.2d 36, 39 (3d Cir. 1993), "a court's task becomes more complicated when exculpatory information is available to the prosecution but is not within . . . its actual knowledge in the context of the particular case[.]" We went on to hold that while a prosecutor is obligated to produce evidence that he or she constructively possesses, "constructive possession" means "that although a prosecutor has no actual knowledge, he should nevertheless have known that the material at issue was in existence." *Id.*, 996 F.2d at 39. This is an objective test; there is no bad faith inquiry.

We found it unreasonable to expect the prosecutor to search all of the unrelated files in his or her office to look for exculpatory material. *See id.* at 40. "While the appellants discount the burden of that search by arguing that the [unrelated file at issue was] prosecuted simultaneously by the same prosecutor [who prosecuted them], the true measure of a prosecutor's *Brady* obligation is whether he knew or should have known of the exculpatory material . . . [I]t is one thing to require honest searches, reasonable in scope, of unrelated files for specific identifiable information, but quite another to send prosecutors on open-ended fishing expeditions." *Id.* at 41.

Here, especially in light of the government's representation, accepted by the District Court, that none of the tapes it reviewed contained *Brady* material, the defense requests would have sent the prosecution on an open-ended fishing expedition, nothing more and nothing less. The defense failed to meet its burden of making a "plausible showing" that the government was obliged to disclose the

remaining tapes under *Brady*. *Riley v. Taylor*, 277 F.3d 261, 301 (3d Cir. 2001)(*en banc*). The fact that some percentage of the tapes that were turned over contained information favorable to the defense is not enough, in light of *Brady*'s materiality requirement. *See United States v. Perdomo*, 929 F.2d 967, 971 (3d Cir. 1991)(*Brady* only requires that the prosecution turn over evidence where there is a reasonable probability that suppressing the evidence would affect the outcome at trial).

The government was also not required to turn over the tapes under the Jencks Act. The Act requires the production of a witness statement "in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500 (b). The government must disclose prior recorded statements of its witnesses that are related to the subject matter of their testimony. *Id.*; *United States v. Hill,* 976 F.2d 132, 139 (3d Cir.1992). Such disclosures must be made after each witness testifies on direct examination. *United States v. Weaver*, 267 F.3d 231, 245 (3d Cir. 2001).

Even assuming, with no great confidence, that the recorded statements of Messrs. Caprio, Natale and Scafidi were "related" in any meaningful way to the subject matter of their testimony, we have held that, "[i]n speaking of statements 'in the possession of the United States,' we understand the statute to require production only of statements possessed by the prosecutorial arm of the federal government." *United States v. Dansker*, 537 F.2d 40, 61 (3d Cir. 1976). In this case, the BOP was not part of the prosecutorial arm of the federal government as it was not at all involved in either the investigation or the prosecution of the defendants.

As for the District Court's rejection of the 17(c) subpoena, defendants acknowledge that impeachment material is generally not subject to pre-trial disclosure under the Rule. They argue, however, that a subpoena should have been granted at trial with regard to each witness after that witness testified. We need not pause to determine whether, had the issue been pressed at the appropriate time at trial, defendants are right or wrong. We simply note that the

burden was on the defendants and they did not raise the issue at any point during trial.

### C. Defendant Angelina's Sufficiency of the Evidence Challenge to Count Eight

Defendant Angelina challenges, on the ground of insufficient evidence, his conviction on Count Eight, which charges that from August 1997 through the Spring of 1999, he conspired with defendants Ciancaglini, Borgesi, and Mazzone to extort Michael Casolaro's sports bookmaking business. Casolaro testified that he was approached by Ciancaglini regarding entering into a "partnership" as to that bookmaking business, and that he wanted no part of that partnership. A meeting was held which was attended by Casolaro, Ciancaglini, Mazzone, and an individual known to Casolaro as "Louie Sheep." It was determined that Casolaro would "take [action from] John Ciancaglini's guys, and Louie Sheep was handling Marty's guys and Georgie's guys and Stevie's guys." "Marty" was defendant Angelina.

Although Angelina was not at the meeting at which the partnership was forced on Casolaro, a reasonable juror could conclude that Casolaro's reference to "Marty's guys" was a reference to individuals who had been placing bets with Angelina. On cross-examination, Casolaro explained that he knew that Angelina had "guys calling in that were betting," "[b]ecause when we did the counts here's Marty's guys and here's this guy's guys and that guy's guys." This supports the conclusion that when Casolaro testified that Louie Sheep would be handling "Marty's guys," both the prosecutor and Casolaro understood this to mean those individuals who regularly placed bets with Angelina. This conclusion surely cuts against the possibility that Angelina was a mere bettor.

Also supporting the conclusion that Angelina was a part of the conspiracy to extort a partnership share in Casolaro's business is the following exchange between the prosecutor and Casolaro:

Q Now why did you continue in a partnership that you didn't want to be in in the first place?

A For the first place, I didn't want to get into it, but when I was talking to John [Ciancaglini], he kind of

said I had to. And I was saying, I don't want to. I don't want to be in this situation. Because I know — to me, I figured it was going to be a no win situation, and he said, you got to, or you got to move, and so I wasn't prepared to move at the time, so I basically just went with the agreement.

Q And now you said that something happened toward the end of March, around — I guess around — that would be about March of 1998, where you — if I recall your testimony correctly, you said that George Borgesi and Marty Angelina both sort of dropped out of the thing?

A Yes.

A reasonable juror could infer that the "thing" that Angelina and Borgesi dropped out of was the partnership discussed in the previous question and answer. Before Angelina dropped out, however, there had been a bad football season and Casolaro, as a result, was "hemorrhaging money." Nonetheless, he had to come up with cash to pay Angelina the $1800.00 he owed him. He turned over what cash he had, $1100.00, and told Borgesi that he needed the approximately $700.00 Borgesi's book owed him to pay Angelina. Borgesi did not want to pay, but it was finally agreed that the $700.00 would be paid directly to Angelina to satisfy the remainder of Casolaro's debt.

The following exchange further supports the conclusion that Angelina was a partner in the conspiracy:

Q And who came to you and asked you for money at Christmas of 1997?

A Marty Angelina.

Q The same Marty Angelina that was supposed to be your partner in this bookmaking operation?

A Yeah.

Angelina, whose career in the LCN stretched back to the early 1980s, clearly knew of the extortionate nature of the LCN's "partnership" with Casolaro. Angelina had a relationship with Casolaro, independent of the bookmaking operation, that centered around annual extortions, termed

the "Christmas shakes."[4] With regard to the Christmas shakes, which were naked demands for cash, no more and no less, and qualitatively different from the bookmaking extortion, Casolaro testified that Angelina did not have to threaten him explicitly with violence because "it was understood," because of the "intimidation factor," and because he feared someone taking a " 'shot' into his book." It is certainly reasonable to infer from this that Angelina was aware that Casolaro had no choice but to do business with the LCN.[5] Angelina's challenge to his conviction on Count Eight is rejected.

### D. Defendant Lutz's Sufficiency of the Evidence Challenge to Count Sixteen (and Racketeering Act 18)

While defendant Lutz challenges his convictions on all of the extortion counts (and the "provens" on the concomitant RA's), we are persuaded that he is correct, but only as to Count Sixteen (and RA18), which charged him with extorting a $1000 contribution for the "George Borgesi Legal Defense Fund" from bookmaker William James Patton in September 1999. It is, we suggest, a somewhat pyrrhic victory, for it appears, at least to us, that under U.S.S.G. § 3D1.4, Lutz's offense level and, hence, his guideline range would not change.

Although we have little or no confidence in Lutz's claim that he had a "voluntary business relationship" with

---

4. The jury found that Angelina was guilty of Counts Nine through Thirteen, which charged him with extorting $5,000 from Casolaro in December of 1995, 1996, 1997, and 1999, and with extorting $10,000 in December of 1998.

5. The partnership's extortionate character is further evidenced by terms which so obviously favored the LCN. Casolaro described the financial arrangement as follows: "It was — all the work was gonna be put in together, and I was financing it. I was like the backer and it would become a 50 percent book. So on the winnings, I would split it 50 percent, and give Louie Sheep, who was handling that end, 50 percent of the money. That was on the winning, and if there was losses, I would pay the losses, I would pay the losses 100 percent." Casolaro testified that he knew from the very beginning of the forced partnership that it was "just a matter of how much money I was going to lose[.]"

Patton, we, nonetheless, agree with him that there was insufficient evidence of his involvement in the September 1999 extortion of $1000 from Patton, whether his supposed extortion be by threatening Patton with physical violence, economic harm, or knowingly exploiting a fear that he knew Patton harbored. Lutz was clearly involved in coercing Patton to "lay off" bets from his bookmaking operation to Borgesi's operation; Lutz clearly extorted "Christmas shakes" from Patton in various years; and Lutz may well have facilitated the extortion of funds for the Borgesi Defense Fund in September of 1999 from Mark Tashie, Patton's bookmaking partner, by pressuring Steven Sharkey, another partner who pled guilty before trial, to keep after Tashie for a contribution from Tashie and then collecting that contribution. But there is little or no evidence that Lutz extorted the $1000 from Patton, and Patton himself testified that he did not give money to the Defense Fund in September 1999, although he believed Sharkey had done so. It is not without significance, we note, that the government has pointed to precious little, if any, evidence supporting Lutz's conviction on Count Sixteen.

### E. Defendant Lutz's Challenge to the Attribution to Him of Certain Victim Losses

Defendant Lutz argues that he should not have received a three-level enhancement to his offense level based on losses which were sustained prior to 1996 when the extortion of bookmakers Patton and Tashie began, an enhancement ordered solely as a result of the testimony of cooperating witness Gaetano Scafidi. We agree.

Scafidi was on the stand for seven days, four of them on direct examination. His extensive and often graphic testimony concentrated on and detailed his involvement and the involvement of the defendants and others in murders and other acts of violence. "We kill each other," he observed at one point, "and it was just part of our life."

Defendant Lutz was rarely mentioned by Scafidi in the course of his lengthy testimony, and when he was mentioned, it was almost in passing. Thus, aside from a couple of references to Lutz's participation in the

"Christmas shakes" of 1992, Lutz's name came up almost exclusively in connection with an insurance scam, irrelevant here, and the fact that he was a close associate of defendant Borgesi and frequented the clubhouse used by the Merlino faction of the LCN, a "guilt by association" or "guilt by mere presence" argument that, without more, would not support the enhancement.[6]

The "more" was Lutz's supposed involvement in the 1992 Christmas shakes. At sentencing, the government argued as follows:

> Your Honor, Gaetano Scafidi testified that . . . there was a Christmas party [in 1992] at which approximately 75 to 100 bookmakers and other criminals were extorted . . . and they came to that party and gave Joseph Merlino varying amounts of money; $2,000, $5,000. It's my understanding that Mr. Scafidi testified that Mr. Lutz was at that party and participated in those extortions, Your Honor.
>
> * * *
>
> Once again, Gaetano Scafidi's testimony was that Angelo Lutz was at the Christmas party in 1992. In addition, he testified that his knowledge of this was based on statements by George Borgesi with whom the defendant has always been closely associated going back well in the 1980s. He was aware of that close association. And based on those statements, as well as his overall knowledge of what happened in September of 1992, as well as what happened in the Christmas party in December of 1992, as well as the defendant's actions thereafter during the period of time before . . . Scafidi removed himself from the Merlino/Natale faction and joined the Stanfa faction, that based on that knowledge as a whole, he was aware that Angelo Lutz was involved in the systematic extortion of bookmakers and other criminals.

---

6. Video footage showed Borgesi and Lutz going to and from the clubhouse and hanging around on the corner. Scafidi testified: "[Y]ou don't think Angelo Lutz kept coming around that corner because he was bringing cakes and cookies every day, do you, heh? He was hanging around us because he was involved with gambling and shakedowns."

The District Court found as follows: "I think I support that position that supports the jury verdict and also the posture in the narrative in the presentence investigation." Lutz challenges the District Court's finding, arguing that the government misrepresented Scafidi's testimony, and that the District Court relied on the government's misrepresentation in concluding that the enhancement was appropriate.

The government concedes that Lutz did not attend the meeting at the Japanese restaurant on Delaware Avenue in September 1992 at which the extortion conspiracy was discussed and implemented. The government also concedes that it misspoke when it advised the District Court at sentencing and this Court in its brief that Borgesi told Scafidi that Lutz, among others, participated in the 1992 Christmas shakes; indeed, the government may also have given the misimpression that Scafidi saw Lutz at a 1992 Christmas party where the shakedowns were paid. But there was no evidence of any such thing. The only Christmas party of which Scafidi spoke occurred in 1984, when Nicky Scarfo held a party at a restaurant and 500 people came, people involved in illegal activities of all types, and each bringing an envelope to Scarfo. Merlino continued the tradition of Christmas shakes when he came out of prison in 1992, and that year, according to Scafidi, Christmas shakes were extracted from 75-100 people — "anyone who was turning in the work to us." Scafidi did not testify that there was a Christmas party; rather, he testified that "We told them a month before Christmas they had to send a package in, depending on the size of the work." "'[J]ust send [the money in],' and that's . . . basically how it was done." In any event, even if there had been a Christmas party in 1992, Scafidi never testified that Lutz was there.

And so what is left vis-a-vis 1992 and Lutz is Scafidi's testimony on direct examination that Lutz participated in these 75-100 shakedowns, and perhaps he did — as Scafidi put it, Lutz "wasn't no saint." Cross-examination, however, rendered this testimony unreliable in the extreme. On cross, Scafidi was forced to concede that he never saw Lutz extort anyone in 1992 and had no personal knowledge that

Lutz had done so; that he never mentioned Lutz's name when he told the FBI, in 100 hours of debriefing, about the extortions which took place in the Fall and at Christmas of 1992; and that he never mentioned Lutz's name in his grand jury testimony about the 1992 Christmas shakes. His statements at trial regarding Lutz and the 1992 shakedowns were, he admitted, inconsistent with what he had told the FBI and the grand jury, and were uncorroborated. In conclusion, Scafidi was only able to say, "I don't know . . . ."[7]

Because there was no reliable evidence that Lutz was involved in the conspiracy from its inception in 1992, we will remand so that Lutz can be resentenced without the three-level enhancement.

### F. Defendant Borgesi's Challenge to the District Court's Alleged Improper Reliance on the Jury's Verdict for Sentencing Purposes

Defendant Borgesi argues that the District Court erred because it supposedly considered itself bound to accept as true all testimony of any witness who had been believed in any respect by the jury at trial. Borgesi acknowledges that the verdict itself and the facts necessarily implied by that verdict are binding on a court for sentencing purposes. *United States v. Boggi*, 74 F.3d 470, 478-479 (3d Cir. 1996). That said, a court is not bound by testimony simply because it came from a witness the jury believed in some — or, indeed, more than some — respects. *United States v. Haut*, 107 F.3d 213, 221 (3d Cir. 1997). Borgesi argues that the District Court refused to make independent findings, based on a preponderance of the reliable evidence, as to (1) when the conspiracy began, (2) how much money was extorted, and (3) whether Borgesi intended to obstruct justice by contacting Scafidi.

At sentencing, during the discussion of the amount of loss attributable to Borgesi, counsel argued that the

---

7. The government, on redirect, concentrated on the violent crimes that were the heart of its case and made no real effort to rehabilitate Scafidi with reference to Lutz's involvement or lack thereof in the 1992 shakedowns.

amount proposed by the Probation Department was not supported by the evidence at trial, in part because "we're talking about believing Mr. Scafidi[.]" The following exchange ensued:

THE COURT: . . . I don't have any role in determining the credibility of the witnesses who testify at trial. If the jury determines them to be credible, they so find. And in this case, they so found Mr. Scafidi — they had to find some of his testimony credible, otherwise Mr. Borgesi would not have been convicted.

MR. NATALI: I disagree with that, Your Honor. I'm not sure that they — they had to find —

THE COURT: Do you think I have a role in determining the credibility of witnesses at the time of sent —

MR. NATALI: Oh, no. No, no, —

THE COURT: Oh, okay.

MR. NATALI: — just on the Scafidi part —

THE COURT: I have to take what the jury gives me, don't I?

MR. NATALI: I don't think they found anything — I don't think they found Mr. —

THE COURT: Well I don't know what they — they found, I wasn't in the room with the jury. But I'm just saying that's their function, and I can't — I can't, at the time of sentencing, look back at testimony and say this person wasn't credible, or that person wasn't credible. That — that's not my function here today.

All I'm here today to determine whether or not the references in the presentence investigation report to — to evidence produced at trial sustains the calculations in this report. And getting back to what [the prosecutor] said, do you disagree that —

> that — with anything that [the prosecutor] has recited as to what occurred, what was testified to —
>
> MR. NATALI:   I agree —
>
> THE COURT:   — at trial?
>
> MR. NATALI:   — the witness said those things.
>
> THE COURT:   Okay, that's all —
>
> MR. NATALI:   The —
>
> THE COURT:   —that's all I can do, sir[.]

The District Court's comments during the above exchange could be interpreted to mean that it believed it was bound to accept all of Scafidi's testimony for purposes of sentencing because the jury had to have believed some or all of that testimony. The Court's comments at other points during the sentencing hearings of defendants Borgesi and Merlino suggest otherwise, however. At Merlino's sentencing hearing, which was referenced by the parties and by the District Court at Borgesi's hearing, the Court made clear that it was aware that "a jury can believe some witness's testimony as to some aspects, and disbelieve others, or not believe any, or believe all." At Borgesi's sentencing hearing, the Court found that the two-point adjustment for obstruction of justice was appropriate based upon a "preponderance of the evidence," noting that Scafidi's testimony had been subjected to vigorous cross-examination. The Court also concluded that "the finding by the probation department [regarding the date the conspiracy began] is supported by evidence, and I therefore approve and adopt same." Finally, the Court "sustain[ed] the presentence investigation report calculation" of the loss amount. In light of this evidence that the District Court understood its role at sentencing, we will not presume that it based its decision upon the one confusing exchange regarding Scafidi's credibility.

## G. Defendant Borgesi's Challenge to the Enhancement of his Sentence for Commission of Crimes While on Probation

Defendant Borgesi argues that the District Court erred when it added two points to his criminal history score after

finding that he committed the extortion conspiracy charged in RA6 while serving a three-year term of probation. More specifically, he argues that the Court erred when it found that the offense began prior to September 6, 1992, the date on which his probation ended. Borgesi argues that this was clear error because the extortion conspiracy was not formalized until a meeting at a Japanese restaurant on Delaware Avenue, which happened in September of 1992.

In fact, the indictment charges that the RA6, the overarching extortion conspiracy, began in April of 1992. At Borgesi's sentencing hearing, the District Court found as follows: "According to the notes of testimony in April during the trial, when Mr. Merlino came out of jail in April of 1992, Scafidi, Borgesi and Angelina were performing shakedowns at that point. They turned the proceeds in to Mr. Merlino and Michael Ciancaglini. Merlino said he was getting a bankroll together, which the crew could use to finance their criminal operations. Mr. Merlino and Mr. Ciancaglini — Michael Ciancaglini became made members by John Stanfa in the late summer of 1992."

When confronted with this testimony at the sentencing hearing, counsel responded that it was not specific as it did not specify the victims of the extortion or the amounts extorted. This lack of specificity argument is unpersuasive. The District Court's approval and adoption of the Probation Department's finding that Borgesi was on probation when he committed some of the crimes of which he was convicted in this case was not clearly erroneous.[8]

## H. Defendants Borgesi and Merlino's Challenge to the District Court's Failure to Give Reasons for their Sentences

Defendants Borgesi and Merlino argue that their cases should be remanded for resentencing — or, we suggest, at

8. The government notes that to the extent Borgesi argues that the shakedowns between April and August of 1992 were not part of the charged conspiracy, this argument should be reviewed for plain error. Whatever the standard of review, the argument fails. Scafidi's testimony was clear that the extortions were not independent conduct but were conducted in the context of the Philadelphia LCN and of the Merlino faction's plot to take control.

least a statement of reasons for the sentences imposed — because the District Court failed to state in open court its reasons for sentencing Borgesi in the middle of the applicable guideline range and Merlino at the top, a statement of reasons required by 18 U.S.C. § 3553 (c)(1). *See* 18 U.S.C. § 3553 (c)(1)(requiring a sentencing judge to state in open court the reasons for its imposition of a sentence within the guideline range whenever that range exceeds 24 months). As this argument was not raised below, it is not cognizable on review unless it constitutes plain error. *See United States v. McCabe*, 270 F.3d 588, 590 (8th Cir. 2001)(in the absence of extenuating circumstances, the failure to raise a § 3553(c) objection at sentencing waives the issue); *United States v. Kingsley,* 241 F.3d 828, 835-36 (6th Cir. 2001)(where no objection made, failure to give reasons subject to plain error review); *United States v. Caicedo,* 937 F.2d 1227, 1236 (7th Cir. 1991)(where no objection made, no entitlement to remand for resentencing).

Thus, for this Court to grant the relief the defendants seek, the District Court must have committed plain error that prejudiced them. *United States v. Adams*, 252 F.3d 276, 285 (3d Cir. 2001). Even where error and prejudice are found, we will only exercise our discretion to correct the error if it " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Id.* (*quoting United States v. Olano*, 507 U.S. 725, 735-736 (1993)). We decline to exercise our discretion to correct any error here, despite the fact that neither Borgesi nor Merlino was sentenced at the bottom of the applicable range. *Cf. United States v. Gricco*, 277 F.3d 339, 363 n.15 (3d Cir. 2002) (failure to provide reasons harmless where defendant received lightest sentence possible). The District Court presided over a four month trial, held lengthy sentencing hearings, and approved and adopted detailed pre-sentence investigation reports. The record created precludes any finding that the absence of a formal statement of reasons had — or has — the potential to seriously affect the "fairness, integrity or public reputation" of the proceedings in this case.

## IV.

For the foregoing reasons, and with the exception only of defendant Lutz's conviction on Count Sixteen (and finding of "proven" on RA18) and the three-level enhancement to his offense level, the judgments of conviction and sentence will be affirmed.

A True Copy:
       Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*