UNITED STATES of America, Plaintiff–Appellee,

v.

John Manuel MELENDREZ, Defendant–Appellant.

No. 03–30221.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 2004.

Filed Nov. 9, 2004.

Craig E. Weinerman, Assistant Federal Public Defender, Eugene, OR, for the defendant-appellant.

Sean B. Hoar, Assistant United States Attorney, Eugene, OR, for the plaintiff-appellee.

Before: HUG, McKEOWN and FISHER, Circuit Judges.

FISHER, Circuit Judge:

John Manuel Melendrez used six stolen Social Security numbers to manufacture bogus identification documents on his computer, including Social Security cards and Armed Forces Report of Separation Forms ("DD Forms 214"). The Social Security cards and DD Forms 214 were a mix of the real and fictitious: Melendrez made up a fake name to go with each of the real Social Security numbers he used to produce those identification documents.

At issue is whether the district court correctly applied to Melendrez's base offense level a six-level enhancement intended to target "identity theft." *See* U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 2B1.1(b)(9)(C) (2002).[1] This enhancement, which admittedly requires some parsing, applies when a defendant uses a means of identification—such as the stolen Social Security numbers here (the "source ID number")—to produce or obtain another means of identification—such as the duplicated Social Security numbers on the bogus Social Security cards (the "produced ID number"). It also applies if a defendant possesses five or more such produced ID numbers. *See id.* Both the source ID numbers and the produced ID numbers must be of actual, not fictitious, persons other than the defendant himself. *See id.* at cmt. n. 7(A). Melendrez's challenge to his sentence focuses on this limiting requirement.

Melendrez claims that the enhancement should not apply because "[e]ach of the *documents* created by [Melendrez] were [sic] in his own name or the name of a fictitious individual." This argument mis-

---

1. All references to the Sentencing Guidelines are to the November 1, 2002, version.

construes the statutorily defined term, "means of identification." For purposes of the statute, a means of identification is the identifying name or number of an actual person, not the document on which such name or number is often placed. The produced ID numbers here are the Social Security numbers that Melendrez admits are of actual persons, not the Social Security cards or DD Forms 214. We therefore affirm Melendrez's sentence.

## I.

From September to November 2001, Melendrez used his computer to create at least eight identification documents bearing six victims' Social Security numbers. Each document associated a made-up name with each of the Social Security numbers. For example, Melendrez paired Social Security number * * *-* *–3911 with the fake name "Paris Alicia Dupree" to create both a Social Security card and a DD Form 214 bearing this number and name.[2] He followed the same modus operandi in fashioning six other bogus Social Security cards or DD Forms 214.[3]

On January 9, 2003, Melendrez pled guilty without a plea agreement to a single-count indictment charging him with unlawfully producing more than five identification documents in violation of 18 U.S.C. § 1028(a)(1), (b)(1)(A)(i) and (ii), (b)(1)(B). The presentence report ("PSR") recommended that his offense level of 6 be increased to 12 pursuant to U.S.S.G.

§ 2B1.1(b)(9)(C). Rejecting Melendrez's objection to the enhancement's application to his crime, the district court adopted the PSR's recommendation and sentenced Melendrez to 30 months imprisonment, the low end of the Sentencing Guidelines. The court entered judgment on May 13, 2003, and Melendrez filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II.

Aided substantially by the convoluted wording and structure of the enhancement and its commentary, Melendrez asserts here as he did in the district court that the enhancement should not apply because the identification documents he produced did not use the actual names of the persons to whom the Social Security numbers were assigned. The district court rejected this argument because, "regardless of the name, the Social Security number is still used in [a] fashion to identify a specific individual to [whom] the number was originally assigned." We agree with the district court.

■■■ We treat the Sentencing Guidelines as a statute for interpretation purposes. See United States v. Soberanes, 318 F.3d 959, 963 n. 4 (9th Cir.2003); United States v. Gonzalez–Mendez, 150 F.3d 1058, 1060 (9th Cir.1998). We review the district court's interpretation and ap-

2. Because the record does not reveal whether the stolen Social Security numbers have been cancelled, we identify them only by their last four digits.

3. In two of these instances, Melendrez paired the Social Security number * * *-* *–8897 with the name "Juan Miguel Melendrez" in creating a Social Security card and a DD Form 214. We consider "Juan Miguel Melendrez" to be a fictitious name because Melendrez's real name is John Manuel Melendrez.

Melendrez also obtained an actual Colorado driver's license bearing the pseudonym "Juan Miguel Melendrez," the Social Security number * * * * *–8897 and a photograph of himself. Because the district court did not appear to consider the license in its determination, and because we conclude the enhancement is applicable even in the absence of the driver's license, we shall not consider it.

plication of the Sentencing Guidelines de novo. *See United States v. Garcia,* 323 F.3d 1161, 1164 (9th Cir.2003). The court's application of the Sentencing Guidelines to the facts of a particular case is reviewed for abuse of discretion. *See United States v. Technic Servs., Inc.,* 314 F.3d 1031, 1038 (9th Cir.2002).

Section 2B1.1(b)(9)(C) of the Sentencing Guidelines implemented section 4 of the Identity Theft and Assumption Deterrence Act of 1998 (the "Identity Theft Act"), Pub.L. No. 105–318 (enacted).[4] The enhancement is intended to target "an aggravated form of identity theft known as 'affirmative identity theft' or 'breeding,' in which a defendant uses another individual's name, social security number, or some other form of identification (the 'means of identification') to 'breed' (*i.e.,* produce or obtain) new or additional forms of identification." U.S.S.G. § 2B1.1 cmt. background.[5] That said, the enhancement is rather awkwardly written, but parsing its terms, incorporated cross-references and relevant commentary reveals its clear application to Melendrez's offense.

We begin with the pertinent language of § 2B1.1(b)(9), which states:

(b) Specific Offense Characteristics

\* \* \*

(9) If the offense involved

\* \* \*

(C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification; or

(ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification,

increase by 2 levels. If the resulting offense is less than level 12, increase to level 12.

U.S.S.G. § 2B1.1(b)(9)(C). The base offense level of 12 is intended to account for the seriousness of the offense, the difficulty of detecting the crime prior to certain harms occurring and the non-monetary harm associated with these types of offenses. U.S.S.G. § 2B1.1 cmt. background.

The Sentencing Guideline specifies that the critical term here—"means of identification"—"has the meaning given that term in 18 U.S.C. § 1028(d)(4), except that such means of identification shall be of an actual (*i.e.,* not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 2B1.1 cmt. n. 7(A). The United States Code provision referred to, 18 U.S.C. § 1028(d)(4), defines the term "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any ... social security number...." 18 U.S.C. § 1028(d)(4)(A) (2000 & Supp. I).[6] For

---

4. The Identity Theft Act directed the Sentencing Commission to "review and amend the Federal sentencing guidelines and the policy statements of the Commission, as appropriate, to provide an appropriate penalty for each offense under [18 U.S.C. § 1028]." Identity Theft Act, Pub.L. No. 105–318 § 4(a), 112 Stat. 3007 (1998).

5. The dissent's main objection with our reading of the statute is that we define "another" to mean "additional," while the dissent defines "another" to mean "different." Dissent at 837–38. The background expressly refers to both "new" and "additional" forms of identification rather than limiting itself to "new" forms of identification.

6. The definition of "means of identification" is now located at 18 U.S.C. § 1028(d)(7) (2004), due to revisions.

convenience and understanding, we shall combine and restate the relevant provisions. The enhancement applies if the offense involved:

(i) the unauthorized transfer or use of any *means of identification* [*i.e.,* "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any . . . social security number . . . ." *and* which "shall be of an actual (*i.e.,* not fictitious) individual, other than the defendant . . ."] unlawfully to produce or obtain any other *means of identification* [as defined]; or

(ii) the possession of 5 or more *means of identification* [as defined] that unlawfully were produced from, or obtained by the use of, another *means of identification* [as defined].[7]

*See* U.S.S.G. § 2B1.1(b)(9)(C) (emphasis added); *id.* cmt. n. 7(A); 18 U.S.C. § 1028(d)(4).

As noted before, the enhancement identifies two means of identification relevant here: the source ID numbers and the produced ID numbers, both of which must "be of an actual (*i.e.,* not fictitious) individual, other than the defendant." U.S.S.G. § 2B1.1 cmt. n. 7(A). The source ID numbers in this case are of actual individuals, as it is undisputed that Melendrez obtained and used Social Security numbers belonging to six actual persons. Therefore, the produced ID numbers—the *same* Social Security numbers as the source ID numbers—must by definition meet the statutory requirements regardless of Melendrez's having paired the numbers with fictitious names on the bogus Social Security cards and DD Forms 214.[8]

Melendrez's argument appears to confuse the term "means of identification" with another statutorily defined term, "identification document." An identification document is "a document . . . intended or commonly accepted for the purpose of identification." 18 U.S.C. § 1028(d)(2)(2002). A means of identification, in contrast, is the name or number that may often be associated with such a document. 18 U.S.C. § 1028(d)(4). Thus, the Social Security cards and DD Forms 214 are identification documents, but the

---

**7.** The verb "produce" that is used in the enhancement is defined in the commentary as, among other things, "duplicated." U.S.S.G. § 2B1.1, cmt. 8(A). Replacing "produced" with "duplicated" in the Sentencing Guidelines' text results in the following: the enhancement applies when a defendant "possess[es] 5 or more means of identification that unlawfully were [duplicated] from . . . another means of identification." Although "duplicated" is not defined in the Sentencing Guidelines, the dictionary describes it as "to become duplicate"; "duplicate" in turn means "[i]dentically copied from an original." THE AMERICAN HERITAGE COLLEGE DICTIONARY 426–27 (3d ed.2000). Thus, the enhancement targets defendants who possess "5 or more means of identification that unlawfully were [identically copied from an original] . . . means of identification." If the enhancement applies where a produced ID is "identically copied" from the source ID, it *cannot require*—contrary to the

dissent's reading—that there be two distinct means of identification, except in the sense that there actually must be two distinct uses of the same means of identification. In other words, there must be an original source ID (i.e., a Social Security number) and then some additional use of the same Social Security number, such as a new identification document.

**8.** Because Melendrez admits that the Social Security numbers were assigned to actual persons other than himself, we do not run afoul of *Blakely v. Washington*, — U.S. —, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), even assuming its applicability to this case. *See id.* at —, 124 S.Ct. at 2541 ("When a defendant pleads guilty, the state is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding.").

means of identification are the Social Security numbers that he placed on the documents.[9]

That real Social Security numbers shared space on bogus identification documents with fictitious names does not make the enhancement inapplicable. Those nine digits tied the victims to the identification documents, regardless of the names with which the Social Security numbers were paired. 18 U.S.C. § 1028 does not require that a name *and* Social Security number be used together to qualify as a means of identification. To the contrary, § 1028 defines a means of identification as "any name or number that *may be used, alone* or in conjunction with any other information, to identify a specific individual." 18 U.S.C. § 1028(d)(4) (emphasis added); *see United States v. Williams,* 355 F.3d 893, 896–97, 899–900 (6th Cir.2003) (applying § 2B1.1(b)(9)(C)(i) to two defendants who each used their own names and stolen Social Security numbers to apply for a Federal Housing Administration loan, holding that 18 U.S.C. § 1028 does not require that both an actual name and actual Social Security number be used together to constitute a means of identification). The identification documents Melendrez produced used actual Social Security numbers belonging to actual people—numbers that alone or in combination with other information could be used to identify specific individuals.

The dissent argues that "[t]he critical point is that the enhancement requires one 'means of identification' to produce another 'means of identification.' A single 'means of identification' is not sufficient." Dissent at 15815. In other words, the source ID number and the produced ID number must be *different.* We respectfully disagree; there is no requirement that the source ID and the produced ID be different numbers. Under the dissent's reading, an individual could use an actual person's driver's license number to breed a new driver's license and not be subject to the enhancement. As shown below, "Jan Smith" could create a fake license using Jane Doe's real driver's license number and, for instance, incur numerous driving tickets, all of which would be tied to Jane Doe (and her actual driver's license number).

| REAL ID (Source ID) | Fake ID (Produced ID) |
| --- | --- |
| Jane Doe | Jan Smith |
| DL # 12345 | DL # 12345 |
| Los Angeles, California | Los Angeles, California |

Contrary to the dissent's reading, this act of breeding falls precisely within the language of the enhancement: Jan Smith has used one means of identification (Jane Doe's real driver's license number) to breed another means of identification (the fake ID with the real driver's license number). Because the fake ID contains Jane Doe's real driver's license number, it could be used to identify her. As a consequence, Jane Doe will have to suffer the consequences of Jan Smith's use and misuse of her driver's license number included in the fake ID. This act of breeding is specifically the kind of conduct that the enhancement targets.[10]

Accordingly, the enhancement, as applied to Melendrez, is appropriate under either subsection (i) or (ii). Melendrez used the six Social Security numbers "unlawfully to produce or obtain" other "means of identification," U.S.S.G.

---

**9.** The fictitious names are "means of identification" as defined under 18 U.S.C. § 1028(d)(4). The fake names would not support application of U.S.S.G. § 2B1.1(b)(9)(C), however, given the enhancement's requirement that any means of identification be of an actual person. *See* U.S.S.G. § 2B1.1 cmt. n. 7(A).

**10.** *See also infra* note 13.

§ 2B1.1(b)(9)(C)(i), and he "possess[ed] five or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification." *Id.* § 2B1.1(b)(9)(C)(ii).

Our reading of the enhancement is also consistent with *United States v. Riley*, 335 F.3d 919 (9th Cir.2003), in which Riley challenged his sentence enhancement under the predecessor to the provision at issue here, U.S.S.G. § 2F1.1(b)(5)(C)(ii) (2000). *Riley*, 335 F.3d at 930. Riley had pled guilty to a conspiracy in which he and others stole checks, scanned them into a computer and produced checks using the stolen account numbers (the source ID numbers) with names other than those of the victims. *See id.* at 923. Although the government had waived its argument that an enhancement could be based on Riley's possession of the stolen account numbers, we acknowledged that on remand the government could seek such an enhancement. *See id.* at 930 n. 6. Thus we suggested that an enhancement may apply where the produced ID numbers (the stolen account numbers) appeared on documents (the checks) in conjunction with fake names.

Attempting to undermine the common-sense interpretation of the enhancement, Melendrez points to application notes in which the Sentencing Commission sets forth examples of conduct to which

U.S.S.G. § 2B1.1(b)(9)(C)(i) does and does not apply. Application Note 7(C)(ii) says the enhancement would be appropriate when a defendant obtains an individual's personal information, such as her name *and* Social Security number or name and address, and "obtains a bank loan in that individual's name," U.S.S.G. § 2B1.1 cmt. n. 7(C)(ii)(I), or "applies for, obtains, and subsequently uses a credit card in that individual's name." *Id.* cmt. n. 7(C)(ii)(II). In these examples, the account number of the bank loan and the credit card number are the other means of identification that have been obtained unlawfully.[11] *Id.* In contrast, subsection (b)(9)(C)(i) would not apply when a defendant uses a credit card from a stolen wallet "only to make a purchase," *id.* cmt. n. 7(C)(iii)(I), or "forges another individual's signature to cash a stolen check," *id.* cmt. n. 7(C)(iii)(II), because the defendants did not produce or obtain another means of identification.

Neither set of examples perfectly matches Melendrez's crime, but we conclude that his actions are more like those in the first set of examples. Unlike the second set, Melendrez produced another means of identification (the Social Security number) by duplicating the source ID number on bogus identification documents.[12] As discussed above, that Melen-

---

**11.** Subsection II actually identifies the credit card itself, rather than the account number, as the means of identification that was produced. U.S.S.G. § 2B1.1 cmt. n. 7(C)(ii)(II). We nonetheless interpret the enhancement to mean that the credit card number is the means of identification, rather than the piece of plastic on which that account number is embossed. Although the question is primarily one of semantics, the enhancement is most easily understood by separating the means of identification from the identification documents on which they appear.

**12.** The dissent argues that Melendrez's use of the Social Security cards does not "implicate

the more serious harm contemplated by Congress and the Sentencing Commission," but concedes that "Melendrez could have used the Social Security cards to create more mischief." Dissent at 840. Indeed, replicating and using a person's Social Security number, even without opening a credit card account or obtaining a driver's license, can cause serious harms that Congress intended to punish, such as "harm to the individual's ... reputation ..., inconvenience, and other difficulties resulting from the offense." U.S.S.G. § 2B1.1 cmt. background. One common use of a victim's Social Security number, for instance, is to obtain a job in order to benefit from the victim's lack of criminal record or United

drez paired the Social Security numbers with fictitious names on the identification documents does not sever the ties linking the victims and the Social Security numbers.[13]

Melendrez also posits that the enhancement should apply only when a defendant poses as the victim to whom the pilfered means of identification belongs. The enhancement clearly is not so limited, however, because the commentary states that an upward departure may be appropriate when a defendant "produced or obtained numerous means of identification with respect to one individual and *essentially assumed that individual's identity.*" U.S.S.G. § 2B1.1 cmt. n. 15(A)(vii)(III)

(emphasis added). Melendrez's construction would make the enhancement essentially redundant, because a defendant who used numerous means of identification to pose as the victim would already qualify for an upward departure; a further two- to six-level enhancement would be double counting.

■ Finally, Melendrez asks for application of the rule of lenity. Under this rule, we construe ambiguities in criminal statutes in favor of defendants, but only if the statute is truly ambiguous. *See United States v. Gonzalez–Mendez*, 150 F.3d 1058, 1061 (9th Cir.1998). Although this guideline could be stated with less com-

---

States citizenship. *See* Michael W. Perl, *It's Not Always About the Money: Why the State Identity Theft Laws Fail to Adequately Address Criminal Record Identity Theft*, 94 J. of Crim. L. & Criminology 169, 179 (2003) (discussing convicted criminals' use of victims' identities to pass security checks for employment); *Tyson Foreign Workers Must Prove Status*, 5/14/04 Rich. Times–Dispatch, May 14, 2004, at C2 (noting that about 60 immigrant workers at a Tyson Foods' plant in Virginia were using Social Security numbers that belonged to other people).

13. The dissent states that our interpretation "would subject to the enhancement an underage student trying to enter a bar with a fake ID.... This result Congress surely did not intend." Dissent at 840 (citing S.Rep. No. 105–274, at 17) (Additional Views of Senator Leahy). The applicability of the enhancement, however, depends upon whether the underage student breeds a fake ID, or merely possesses or uses a fake ID; the sentence enhancement targets breeding and not mere possession or use. *See* S.Rep. No. 105–274, at 16–17 (Additional Views of Senator Leahy) ("[The bill] has come a long way from its original formulation, which would have made it an offense, subject to 15 years' imprisonment, to *possess* 'with intent to deceive' identity information issued to another person. I was concerned that the scope of the proposed offense would have resulted in the federalization of the status offense of underage teenag-

ers *using* fake ID cards to gain entrance to bars or to buy cigarettes, or even the *use* of a borrowed ID card without any illegal purpose.") (emphasis added).

If, for example, an underage boy borrows his older brother's driver's license, and uses it in order to enter a bar, he would not be subject to the enhancement because he did not breed the fake ID. Similarly, if an underage girl changed the date of birth on her own driver's license in order to gain entrance to a bar, she would not be subject to the enhancement because she only altered her own ID and did not breed a new one. In addition, if an underage boy created a fake ID by combining a made-up driver's license number with his own name or a made-up name, he would not be subject to the enhancement because he did not breed the fake ID. If, in contrast, an underage girl created a new driver's license by pairing someone else's real driver's license number with her name or a made-up name, she would be subject to the enhancement because she produced another means of identification (the driver's license number) by duplicating the source ID number on a bogus identification document. Here, the identification document the girl produced used an actual driver's license number belonging to an actual person—a number that alone or in combination with other information could be used to identify a specific individual. This act of breeding is specifically the kind of conduct that the enhancement targets.

plexity, its meaning is not sufficiently ambiguous to invoke the rule of lenity.

## III.

For the foregoing reasons, we hold that the district court correctly enhanced Melendrez's sentence under U.S.S.G. § 2B1.1(b)(9)(C).

**AFFIRMED.**

McKEOWN, Circuit Judge, dissenting:

In my view, despite its efforts at "parsing" the enhancement language challenged by Melendrez, the majority has garbled a different aspect of U.S.S.G. § 2B1.1(b)(9)(C)—the requirement that the means of identification serving as the basis for the sentencing enhancement be "bred" from another means of identification. Because the district court based its sentence on a similar misreading of the guidelines, I would vacate and remand for resentencing.

What Melendrez did—manufacture bogus identification documents on his computer—was illegal. And because he pleaded guilty to unlawfully "produc[ing] an identification document or a false identification document," 18 U.S.C. § 1028(a)(1), he will serve time in federal prison. In other words, Melendrez will be punished for creating false identification. The question is whether the identity theft enhancement applies. In my view, it does not because only a single means of identification was involved.

As the majority aptly notes, we are presented with "the convoluted wording and structure of the enhancement and its commentary." Op. at 831–32. The language is ambiguous at best—a point underscored by the ink spilled by both the majority and the dissent. Here, the lack of clarity requires that we invoke the rule of lenity and adopt a narrow construction of the en-

hancement, the one most favorable to Melendrez. *See United States v. Ramirez,* 347 F.3d 792, 799–800 (9th Cir.2003) (holding in sentencing guidelines context that "the rule of lenity requires that we construe ambiguous terms in favor of the accused").

## I. The Text of the Sentencing Provision

United States Sentencing Guidelines § 2B1.1(b)(9)(C) calls for a sentencing level increase if Melendrez's offense involved "(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification; or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification." As is clear from this language, § 2B1.1(b)(9)(C) contemplates an increased prison term in situations where one means of identification was used to produce an additional one. The circumstances at issue here, however, do not fall into this category.

At first blush, the text of the enhancement provision appears relatively straightforward. But upon closer examination, it becomes apparent that the term "means of identification" conceals a number of potential pitfalls. Although intuition might suggest that a hard copy document such as a driver's license card or Social Security card falls under its definition, the statute itself reveals otherwise. *See* 18 U.S.C. § 1028(d)(4). As the majority correctly observes, "a means of identification is the *identifying name or number* of an actual person, *not the document* on which such name or number is often placed." Op. at 830–31 (emphases added). In short, the target of the enhancement inquiry is the involvement of one "identifying name or number" to produce another "identifying

name or number." *Cf.* Op. at 833 (noting that "the enhancement identifies two means of identification relevant here: the source ID numbers and the produced ID numbers").

Applying this formulation to the facts at hand, each bogus Social Security card or DD Form 214 Melendrez crafted on his computer contained one "means of identification" of an actual person—the Social Security number itself. But in each instance, only one "identifying name or number" was ever involved. None of the Social Security numbers was produced or obtained from "another" or "any other" "identifying name or number." Indeed, in the words of the majority, "the produced ID numbers [were] the *same* Social Security numbers as the source ID numbers." Op. at 833. Close examination thus reveals that the Social Security cards and DD Forms 214 do not support the district court's application of § 2B1.1(b)(9)(C)'s enhancement to Melendrez's offense.

The majority's comfort with the opposite conclusion is odd indeed. Unlike the district court, the majority avoids the most tempting misconstruction of the sentencing provision yet somehow still reaches the wrong result. Its trajectory from acknowledging that the means of identification were "the *same,*" Op. at 833 (emphasis in original), to its assertion that "Melendrez produced *another* means of identification (the Social Security number) by duplicating the source ID number," *id.* at 835 (emphasis added), can perhaps best be understood as arising from an error we have recently described as a "category mistake." *See Planned Parenthood v. Wasden,* Nos. 02–35700, 02–35714, 376 F.3d 908, 930 n. 21 (9th Cir. July 16, 2004) ("[A] category mistake treats a concept as if it belonged to one logical type or category when it actually belongs to another." (alterations omitted)). In other words, the majority confuses the identifying number (a concept) with its representative symbols as they appear on paper (an iteration of the concept).

The majority's approach would be correct if the sentencing provision targeted the production of another *iteration* of an identifying name or number. After all, Melendrez took one iteration of a Social Security number (either written on a piece of paper or simply in his head) and produced another iteration (on the false Social Security card). But the plain text of § 2B1.1(b)(9)(C) speaks simply of the "means of identification," defined by the statute as a "name or number," and requires it to be produced or obtained from another "means of identification." The critical point is that the enhancement requires one "means of identification" to produce another "means of identification." A single "means of identification" is not sufficient. In the case of the Social Security cards and DD Forms 214, no "other means of identification" was ever involved in their production besides the Social Security number itself. Under the only logical reading of § 2B1.1(b)(9)(C), these forms of identification fail to qualify Melendrez for the enhancement.

## II. The Purpose of § 2B1.1(b)(9)(C)

The legislative history surrounding the adoption of § 2B1.1(b)(9)(C) supports the view that the enhancement was not meant to apply to the circumstances here. The Identity Theft and Assumption Deterrence Act of 1998 ("ITADA"), Pub.L. No. 105–318, was enacted to fill a gap in federal criminal law.[1] Before its adoption, "only

---

1. ITADA directed the United States Sentencing Commission to amend the Sentencing Guidelines. The result was the adoption of

fraud in connection with identification *documents* [was] a crime." S.Rep. No. 105–274, at 5 (1998). ITADA made "fraud in connection with identification *information* a crime." *Id.* The new law was Congress's response to the growing potency of information alone (without traditional paper documentation) and the concomitant risk of harmful misuse. *See id.* ("Today, criminals do not necessarily need a document to assume an identity; often they just need the information itself to facilitate ... crimes .... [T]his statute can keep pace with criminals' technological advances."); *cf. id.* at 11 (" 'Means of identification' is a core definition in this bill, intended to capture the varieties of individual identification information technologically feasible which can be compromised and criminally used.").

ITADA's directive to the Sentencing Commission contemplated "enhanced penalties for aggravating circumstances often associated with identity theft crimes." *Id.* at 5. Recognizing that "there exists no clear definition of identity fraud," but that it generally "involves 'stealing' another person's personal identifying information .... to fraudulently establish credit, run up debt, or to take over existing financial accounts," *id.* at 7, Congress urged the Sentencing Commission to consider the impact on identity theft victims as a possible "measure for establishing penalties." *Id.* at 12. Individual victims, Congress reported, can sometimes suffer "devastating" harm. *Id.* at 7. Particularly unfortunate victims have had "their credit ratings ruined and be[come] unable to get credit cards, student loans, or mortgages .... [And some victims] have even been arrested for crimes they never committed." *Id.* at 16 (additional views of Senator Leahy).

When the Sentencing Commission implemented ITADA, it "determined that the

more aggravated and sophisticated forms of identity theft, about which Congress seemed particularly concerned, should be the focus of enhanced punishment under the guidelines." U.S. Sentencing Guidelines Manual app. C § 596 (2002). The Commission explained that "[s]uch offense conduct ... generally occurs within the context of financial and credit account takeovers, [and] involves affirmative activity to generate or 'breed' another level of identification means without the knowledge of the individual victim...." *Id.* Heightened punishment for such "sophisticated" activity is appropriate "because of the additional steps the perpetrator takes to 'breed' additional means of identification in order to conceal and continue the fraudulent conduct." *Id.*

It is evident from this legislative background that the "affirmative identity theft" targeted by § 2B1.1(b)(9)(C) involves the generation of additional identifying information, not documents. The application notes are in accord. Both scenarios offered by the Sentencing Commission as examples of when the enhancement applies involve the production of a different *form* of identifying information. In the first example, the defendant uses the victim's name and social security number to obtain a bank loan. The bank loan account number is the means of identification that was "bred." *See* U.S.S.G. § 2B1.1 cmt. n. 7(C)(ii)(I) (2002). In the second example, the defendant uses the victim's name and address to apply for and obtain a credit card. There, the credit card account number is the new means of identification. U.S.S.G. § 2B1.1 cmt. n. 7(C)(ii)(II).

In contrast, in the scenarios offered by the Sentencing Commission as examples of where the enhancement would be inapplicable, the defendant has not generated any

the provision at issue. *See* Pub.L. No. 105–318, § 4.

additional piece of identifying information. *See* U.S.S.G. § 2B1.1 cmt. n. 7(C)(iii) (explaining that the enhancement does not apply to a defendant who uses a stolen credit card to make a purchase or to a defendant who forges a victim's signature to cash a stolen check). In those cases, as here, the defendant has not engaged in "breeding" and does not deserve the enhancement. In short, no additional or "other means of identification" is produced.

Thus, while I agree with the majority that § 2B1.1(b)(9)(C) encompasses more than just full-blown identity takeover, I do not agree with its conclusion that the enhancement applies to the Social Security cards and DD Forms 214 Melendrez produced. None of these forms of identification was the product of "breeding." They each involved one, and only one, means of identification—the Social Security number. Nor do these forms of identification implicate the more serious harm contemplated by Congress and the Sentencing Commission. Although it is true that in this case Melendrez could have used the Social Security cards to create more mischief, perhaps by opening a credit card account or obtaining a driver's license, such an action *would* amount to affirmative identity theft and therefore qualify him for the enhancement.

The majority's interpretation, in contrast, would subject to the enhancement an underage student trying to enter a bar with a fake ID he created using a real person's driver's license number. This result Congress surely did not intend. *Cf.* S.Rep. No. 105–274, at 17 (Additional Views of Senator Leahy) (explaining that the bill was tailored to avoid "federaliza-

tion of the status offenses of underage teenagers using fake ID cards to gain entrance to bars or to buy cigarettes"). Nor does such a sweeping interpretation make much sense. Congress made explicit that ITADA was meant to address the developing new problem of identification *information* misuse, not the old problem of fake identification *document* production. The majority's reading of § 2B1.1(b)(9)(C) vastly broadens its application while ignoring the purpose behind its adoption. I therefore conclude that the district court should not have applied the enhancement on the basis of the Social Security cards and DD Forms 214.[2]

Accordingly, I respectfully dissent.

---

**2.** Whether the enhancement applies on the basis of other documents found in Melendrez's possession that may have been the product of "breeding," such as the Colorado driver's license, is another question entirely, one that should be remanded to the district court.