

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-27-2008

# USA v. Hawes

Precedential or Non-Precedential: Precedential

Docket No. 06-3334

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Hawes" (2008). *2008 Decisions.* Paper 1338.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1338

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-3334

UNITED STATES OF AMERICA

v.

BRYAN J. HAWES
a/k/a FINANCIAL MANAGEMENT
ADVISORY SERVICES, INC.
a/ka/ FINANCIAL MANAGEMENT SERVICES, INC.

Bryan J. Hawes,
Appellant

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal No. 04-cr-00082)
District Judge:  Honorable Donetta W. Ambrose

Argued November 1, 2007

Before:  RENDELL, WEIS and NYGAARD, <u>Circuit</u> <u>Judges</u>.

(Filed: March 27, 2008)

---

James J. Brink, Esq.    **[ARGUED]**
428 Forbes Avenue, Suite 220
Lawyers Building
Pittsburgh, PA  15219
   *Counsel for Appellant*

 Robert L. Eberhardt, Esq.
Michael L. Ivory, Esq.    **[ARGUED]**
Office of United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
   *Counsel for Appellee*

---

OPINION OF THE COURT

---

RENDELL, *Circuit Judge*.

Brian Hawes appeals from his sentence imposed after a plea of guilty to two counts of mail fraud in violation of 18 U.S.C. § 1341.  He was sentenced to a term of 78 months' imprisonment.  Hawes argues that the District Court improperly calculated the applicable Guideline range.  We agree and will vacate the sentence imposed by the District Court and remand for resentencing.

2

## I. FACTS AND PROCEDURAL HISTORY

Brian Hawes was a registered investment advisor and owner and president of two investment advisory services, Financial Management Advisory Services ("FMAS") and Financial Management Services, Inc. ("FMS"). In 1997, he became an authorized representative of Fidelity Investments Investment Advisors Group ("Fidelity").

From 1988 through 2003, Hawes used his position as an investment advisor to defraud his clients of monies that they had entrusted to him. He would agree to purchase annuities on behalf of his clients, but instead would keep the money for personal use or buy the annuities as instructed but later liquidate them for his own use. To conceal his theft, he created false account statements, indicating higher account balances, and submitted them to his clients.

In 1998, Hawes persuaded a number of his clients to move their assets into investment products offered by Fidelity. For these investment product accounts, Fidelity would mail account statements at regular intervals directly to a client's residence or address of choice. Until 2002, Hawes would also issue statements to his clients through his investment advisory service, FMAS, that accurately reflected the Fidelity investments. As a financial advisor, he was authorized to use his clients' social security numbers and other identifying information to access their Fidelity accounts and did so in the regular course of business.

3

Beginning in 2002, however, Hawes used his access to client accounts without his clients' permission and changed the addresses to which his clients' Fidelity account statements were mailed. In some instances, he mailed change of address forms to Fidelity Investments, indicating that future statements should be sent to his office address. In others, he accessed his clients' online accounts and changed the addresses. Hawes then notified his clients that Fidelity would no longer be issuing paper statements and that FMAS would continue to issue paper account statements reflecting their balances with Fidelity.

Hawes then began to divert and transfer client funds into an account for his personal use. To avoid discovery of his theft, he would transfer funds from one client account to another. Through FMAS, he would then issue and provide statements to his clients that did not report the transfers and falsely overstated the value of the Fidelity accounts. Having ensured that his clients would not receive accurate account statements from Fidelity, Hawes was able to hide the fraud from his clients.

In 2003, after his father's death, Hawes' mother discovered that he had been stealing money that his parents had entrusted with him for investment and submitting statements to them that falsely reflected that annuities had been purchased and were earning money. She threatened to report his crime unless the money was repaid, and Hawes agreed to repay a total of $780,000 pursuant to a payment schedule. In order to make the first payment to his mother, Hawes stole $125,000 from other clients' accounts.

On October 31, 2003, Hawes' fraud was uncovered and

4

his accounts frozen. On April 9, 2004, a two-count information was filed, alleging two counts of mail fraud in violation of 18 U.S.C. § 1341. On that same date, Hawes pleaded guilty to both counts. On August 4, 2004, he was sentenced to a term of 98 months' imprisonment, followed by a three-year period of supervised release, and ordered to pay restitution in the amount of $2,601,961.60. In the wake of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), Hawes filed a motion for summary remand on May 3, 2004, and, on August 9, 2005, this Court affirmed Hawes' conviction and remanded for resentencing. The trial court held sentencing hearings on January 30, March 29, and June 29, 2006. App. 78-417.

During the course of the hearings, the District Court heard from Angelica Banta, the probation officer who prepared Hawes' PSR.[1] She testified that, in her opinion, an identity theft enhancement under U.S.S.G. § 2B1.1(b)(9)(C)(i) was proper because Hawes used the social security numbers of his clients to change their addresses so that he would receive the statements indicating the real balances of their investment accounts. Obtaining a change of address was regarded by Ms. Banta as obtaining another form of identification–his clients' mail–and, therefore, subject to the identity theft enhancement. Counsel for the government argued that the name and address was a means

---

[1] The relevant part of the sentencing hearing transcript refers to her as "Angelica Canvann." However, it appears that this was a transcription error, Appellant's Br. 13 n.6, and both the PSR and other portions of the sentencing hearing transcripts identify the probation officer as Angelica Banta.

5

of identification and changing an address was producing another means of identification. Hawes testified that his clients willingly provided him with certain information, including name, address, social security number, date of birth, phone number, and were assigned a unique identification number by the financial institution. He further testified that he had discretionary control over the accounts and prior authorization to engage in any transaction he deemed necessary. Moreover, after Hawes changed a client's address online, by fax, or by email, Fidelity would send a confirmation of the change of address to the client's former address.

At the sentencing hearings, the government presented testimony as to the appropriateness of a vulnerable victim sentence enhancement under U.S.S.G. § 3A1.1(b). Clients defrauded by Hawes were elderly, ill, and unsophisticated. App. 399, 403. In particular, testimony showed that Hawes diverted $87,500 from an account belonging to Dorothy McKinney who, as he was aware, was in a nursing home and suffered from Alzheimer's disease. He did so in order to repay his mother for the funds he had stolen and to prevent her from reporting him to the authorities.

The District Court ruled that by changing the addresses of his clients, Hawes did illegally use a means of identification "to produce or alter duplicate means of identification" and applied a two-level enhancement under U.S.S.G. § 2B1.1(b)(9)(C)(i). The District Court also applied a vulnerable victim enhancement under U.S.S.G. § 3A1.1(b) upon finding that some of the victims were persons with whom Hawes had a close relationship and others were retired, elderly and suffering

6

from Alzheimer's. The calculated Guideline Range was 70 to 87 months' imprisonment.

Hawes was ultimately sentenced to 78 months' imprisonment, followed by a three-year period of supervised release, and ordered to pay $2,276,565.31 in restitution to his victims. Hawes timely appealed his sentence.

## II. DISCUSSION

Hawes raises a number of objections to his sentence: (1) that the District Court erroneously applied a two-level "identity theft" enhancement to his Base Offense Level under U.S.S.G. § 2B1.1(b)(9)(C)(i); (2) that the District Court erroneously applied a two-level "vulnerable victim" enhancement to his Base Offense Level under U.S.S.G. § 3A1.1(b)(1); (3) that his sentence is unreasonable; and (4) that the District Court did not consider the factors set forth in 18 U.S.C. § 3663 in determining the amount of restitution.

We will consider each of these arguments in turn. We review the District Court's application of the Guidelines to the facts for abuse of discretion. *United States v. Cooper*, 437 F.3d 324, 327-28 (3d Cir. 2006). To the extent that Hawes argues that the District Court made a legal error in its interpretation of the Guidelines, we conduct plenary review. *See United States v. Newsome*, 439 F.3d 181, 184 (3d Cir. 2006); *United States v. Moorer*, 383 F.3d 164, 167 (3d Cir. 2004). As to contentions that Hawes did not preserve in the District Court, we use the

7

more exacting plain error standard. *See United States v. Merlino*, 349 F.3d 144, 161 (3d Cir. 2003).

## A. The Identity Theft Enhancement

Hawes contends that his conduct in concealing his fraud does not qualify for a two-level enhancement under U.S.S.G. § 2B1.1(b)(9)(C)(i). To determine whether the District Court erred in interpreting the identity theft enhancement to include Hawes' changing of his clients' addresses, we begin by looking to the language of the Guideline and the statutory language referenced therein.

Under the Guidelines, a two-level enhancement to a defendant's Base Offense Level is appropriate where the offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." U.S.S.G. § 2B1.1(b)(9)(C)(i).[2] The Guideline refers to 18 U.S.C. § 1028(d)(4) (now codified at 18 U.S.C. § 1028(d)(7)), which provides that:

> the term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any--

---

[2]This citation is to the 2002 edition of the Federal Sentencing Guidelines Manual, which was used by the District Court and probation office in sentencing Hawes; this section is now at U.S.S.G. § 2B1.1(b)(10)(C)(i).

8

(A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;

(B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;

(C) unique electronic identification number, address, or routing code; or

(D) telecommunication identifying information or access device (as defined in section 1029(e))[3]

Hawes contends that "the act of changing a person's address is not engaging in the 'unauthorized transfer or use of any means of identification unlawfully to alter or duplicate or assemble [an] alternate hybrid means of identification' or using a means of identification to 'produce an altered duplicate means of

---

[3] The Commentary to U.S.S.G. § 2B1.1 provides that: "'Means of identification' has the meaning given that term in 18 U.S.C. 1028(d)(4), except that such means of identification shall be of an actual (i.e., not fictitious) individual, other than the defendant or person for whose conduct the defendant is accountable" under U.S.S.G. § 1B1.3. This is not at issue in this case as the means of identification used were of actual individuals, Hawes' clients.

identification.'" Appellant's Br. 21 (quoting *United States v. Newsome*, 439 F.3d 181, 185-86 (3d Cir. 2006)).

We begin by asking whether the statute's plain terms address the precise question of whether changing an address constitutes producing or obtaining "any other means of identification." As the Court of Appeals for the Ninth Circuit has observed, "the enhancement is rather awkwardly written." *United States v. Melendrez*, 389 F.3d 829, 832 (9th Cir. 2004). "Means of identification" is defined both in general terms as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual" and in specific terms as an extensive list of particular means of identification. 18 U.S.C. § 1028(d)(7). The text, however, is ambiguous as to whether changing an address falls within its ambit. What is clear is that the statute does not include mail or an address within the list of means of identification; nor are the examples easily analogized to a piece of mail or an address.

Faced with ambiguities in the identity theft enhancement, courts have looked to the application notes, which set forth examples of the types of conduct to which the identification enhancement applies or does not apply.[4] Accordingly, we turn

---

[4] *See, e.g., United States v. Lyle*, 06-16574, 2007 WL 2344873, *2-3 (11th Cir. Aug. 17, 2007) (defendant's "conduct is not meaningfully distinguishable from that described in the Application Notes"); *United States v. Auguste*, 392 F.3d 1266, 1268 (11th Cir. 2004) (looking first to application notes and then to the plain language of the guideline); *United States v.*

10

to them for guidance. The application notes provide:

>(i) In General.--Subsection (b)(10)(C)(i) applies in a case in which a means of identification of an individual other than the defendant (or a person for whose conduct the defendant is accountable under 1.3 (Relevant Conduct)) is used without that individual's authorization unlawfully to produce or obtain another means of identification.

>(ii) Examples.--Examples of conduct to which subsection (b)(10)(C)(i) applies are as follows:

>>(I) A defendant obtains an individual's name and social security number from a source (e.g., from a piece of mail taken from the individual's mailbox) and obtains a bank loan in that individual's name. In this example, the account number of the bank loan is the other means of identification that has been obtained unlawfully.

>>(II) A defendant obtains an individual's name and address from a source (e.g., from a driver's license in a stolen wallet) and applies for, obtains, and subsequently uses a credit card in that individual's name. In this example, the credit

---

*Melendrez*, 389 F.3d 829, 835 (9th Cir. 2004) (looking to application notes and reasoning that "[n]either set of examples perfectly matches Melendrez's crime, but we conclude that his actions are more like those in the first set of examples.").

card is the other means of identification that has been obtained unlawfully.

(iii) Nonapplicability of Subsection (b)(10)(C)(i).--Examples of conduct to which subsection (b)(10)(C)(i) does not apply are as follows:

(I) A defendant uses a credit card from a stolen wallet only to make a purchase. In such a case, the defendant has not used the stolen credit card to obtain another means of identification.

(II) A defendant forges another individual's signature to cash a stolen check. Forging another individual's signature is not producing another means of identification.

Application Note 9(C) to U.S.S.G. § 2B1.1.

Most, if not all, cases involving the identity theft enhancement have factual scenarios that are explicitly laid out in the application notes. *See United States v. Townsend*, 67 Fed. Appx. 986, 987 (8th Cir. 2003) (holding that defendant's use of another's information to apply for a credit card was set forth in comment 7(C)(ii)); *United States v. Geeslin*, No. 05-60616, 2007 WL 756457 (5th Cir. Mar. 9, 2007) (observing that "[i]n the typical § 2B1.1(b)(10)(C)(i) case, a court will impose the enhancement because a defendant used false identification to secure a bank loan"); *United States v. Edelmann*, 192 Fed. Appx. 578, 582 (8th Cir. 2006) (holding that "the application notes to the guidelines clearly encompass a situation like

12

Edelmann's, where another individual's name and Social Security number are unlawfully used to obtain credit.... [T]he use of a name other than the victim's on an unlawfully obtained account does not mitigate the harm caused by the use of 'someone's identifying information to establish new credit.'") (citations omitted); *United States v. Cage*, 134 Fed. Appx. 833, 837 (6th Cir. 2005) ("Cage used her position to gather names, dates of birth, and social security numbers to obtain credit cards, loans, and bank accounts. These facts...mirror the examples listed in the application notes."). Similarly, in cases where the examples in the application notes are not directly on point, the facts are much more closely analogous to the examples than the facts we have here. *See, e.g., United States v. Samet*, 200 Fed. Appx. 15 (2d Cir. 2006).

Neither we nor any other court has held that changing an address constitutes obtaining or producing a new means of identification. Indeed, in *United States v. Auguste*, where defendant had added herself to another person's credit card account as a secondary cardholder and had changed the account's address in order to receive the secondary card, the enhancement applied not because she had changed the address but because she had taken an account number and added her own name to it, thereby creating a new means of identification. 392 F.3d 1266, 1267-68 (11th Cir. 2004).

There is a paucity of case law in this Circuit or others, largely because this sentencing enhancement was only enacted in 2000. *United States v. Cisse*, 103 Fed. Appx. 27 (7th Cir. 2004) (noting that "Section 2B1.1(b)(C)(i) was added to the Guidelines in November 2000, and we have found only one

13

published case [*United States v. Williams*, 355 F.3d 893 (6th Cir. 2003)] discussing its application").

We have issued only one decision interpreting this Guideline, *United States v. Newsome*, 439 F.3d 181 (3d Cir. 2006), which both parties cite and upon which the District Court relied to conclude that the enhancement applied. In *Newsome*, defendants obtained personal contact and account information of Fleet Bank customers and used it to produce drivers' licenses with photographs of defendants and the victims' information, which they then used to withdraw funds from the accounts. *Id.* at 183. The district court held that "Newsome had illegally used one means of identification to produce another," and we agreed that the enhancement was properly allowed. *Id.* at 184. The fraud victim's information–name, birth date, driver's license number, and employee identification number–was a means of identification under 18 U.S.C. § 1028(d)(7). *Id.* The question was whether the information on the new drivers' licenses constituted "any other means of identification." Newsome argued that what he did was use an existing means of identification to obtain cash, not to obtain a new means of identification, like a social security number or a loan account number. We disagreed, reasoning that U.S.S.G. § 2B1.1(b)(9)(C)(i) can be read as requiring the enhancement for "the unauthorized transfer or use of any means of identification unlawfully to alter or duplicate or assemble any alternate hybrid means of identification." *Id.* at 185.

*Newsome*, however, is not very helpful to our analysis, both because the means of identification produced, a driver's license, is specifically mentioned in the commentary to the

14

Guideline and because it involved the sort of "breeding" of means of identification that is targeted by the enhancement. *Id.* at 186; *see* Commentary to U.S.S.G. § 2B1.1, Background (noting that the enhancement "focuses principally on an aggravated form of identity theft known as 'affirmative identity theft' or 'breeding'). Neither one's mail nor address are specifically mentioned in the Guidelines nor is Hawes' conduct easily categorized as breeding means of identification.

We believe that, in light of the language of the Guideline and the examples in the application notes, Hawes' conduct does not qualify for the identity theft enhancement. An address or piece of mail does not seem to fit the Guideline's definition of "means of identification." The government suggests that the general definition of "means of identification" includes a name plus any other piece of information and thus includes a name plus an address. To take the government's argument to its logical conclusion, a name plus shoe size or hair color could constitute a means of identification. We believe that the statute, as the language suggests, requires that the means of identification be specific or unique.

The examples enumerated in 18 U.S.C. § 1028(d)(7) are of unique identifying information, primarily numbers. As the Court of Appeals for the Second Circuit has reasoned, "[b]oth the statute and the Note focus on the generation of a unique identifying number different than any number used to obtain it, not on whether a document would be proffered as a form of identification." *United States v. Samet*, 200 Fed. Appx. 15, 23 (2d Cir. 2006). Similarly, when addressing the argument that bank accounts are not means of identification, the Court of

15

Appeals for the Eighth Circuit found it determinative that "a bank account number is a unique identification number." *United States v. Scott*, 448 F.3d 1040 (8th Cir. 2006). A social security number, account number, or any of the other examples provided within the statute identify one particular individual.

At sentencing, the government also argued that the name and address was a means of identification because it was "the way that Fidelity identified clients in this case." App. 381. From a common sense standpoint, we find this argument difficult to accept. Financial institutions identify their clients, not by name or address (which can be non-unique identifiers), but rather by account number. As Hawes testified, Fidelity was given certain information about clients to set up an account and "[t]he way Fidelity identified a client after that was by the account number." App. 384.

The Application Note examples are similarly confined to a common sense meaning of identity theft through breeding a new means of identification. The examples of when the enhancement applies involve the production of a specific form of identifying information, which is then used for improper purposes, i.e., taking another's identity to use as one's own. In the first example, the defendant uses the victim's name and social security number to obtain a bank loan, the "means of identification" bred. In the second example, the defendant uses the victim's name and address to apply for and obtain a credit card, another unique "means of identification." By contrast, in the examples of when the enhancement does not apply, the defendant has not generated any additional identifying information or engaged in the "breeding" targeted by the

16

enhancement.

Changing an address is not easily analogous to the examples in the application notes. In comparison to the facts in other cases, Hawes' conduct seems closer to the Application Note's examples of conduct that does not constitute identity theft, such as stealing an existing credit card or cashing a check from an existing bank account. Discussing these examples in the application notes, the Court of Appeals for the Sixth Circuit observed that "while the use of someone's credit card to make a purchase is a punishable offense, the nature of the harm is different from that which results from using someone's identifying information to establish new credit." *United States v. Williams*, 355 F.3d 893, 900 (6th Cir. 2003). Likewise, although stealing from client accounts he was authorized to manage is deserving of punishment, the harm caused by Hawes was not the breeding of new identification information or running up new credit, but rather the theft of funds entrusted to him. The change of address was to thwart the discovery of, not enable, the illicit activity.

As the foregoing discussion makes clear, the Guideline, referenced statute, and application notes do not lead to the conclusion that the identity theft enhancement was meant to apply to a change of address.

This conclusion is bolstered by the legislative history of the Identity Theft and Assumption Deterrence Act of 1998, Pub.

17

L. No. 105-318, 112 Stat. 3007 (1998) ("ITADA").[5]   The ITADA was enacted to make "fraud in connection with identification *information* [not just identification documents] a crime." S. Rep. No. 105-274, at 5 (1998) ("Today, criminals do not necessarily need a document to assume an identity; often they just need the information itself to facilitate . . . crimes . . . . [T]his statute can keep pace with criminals' technological advances."). The ITADA provided that although "there exists no clear definition of identity fraud," it typically "involves 'stealing' another person's personal identifying information . . . to fraudulently establish credit, run up debt, or to take over existing financial accounts." *Id*. at 7.

In enacting the ITADA, the Sentencing Commission explained that subsection (b)(10)(C):

> focuses principally on an aggravated form of identity theft known as "affirmative identity theft" or "breeding", in which a defendant uses another individual's name, social security number, or some other form of identification (the "means of identification") to "breed" (i.e., produce or obtain) new or additional forms of

---

[5] Because the statutory meaning is unclear, the legislative history can aid us in discerning the Guideline's purpose and interpreting it appropriately. *See Patterson v. Shumate*, 504 U.S. 753, 761 (1992) (stating that resort to statutory history is appropriate where language of statute is ambiguous or confusing); *United States v. Pollen*, 978 F.2d 78, 85 (3d Cir. 1992).

identification.

Commentary to U.S.S.G. § 2B1.1, Background.  As we said in *Newsome*, "Congress wanted to provide increased punishment for identity theft that involved creation of means of counterfeit identification rather than the plain vanilla type of identity theft that occurs when person A steals and uses person B's credit card. ... This multiplication of means of identification is the type of identity theft that Congress believed deserved greater punishment." *Newsome*, 439 F.3d at 186.  As other courts of appeals have observed, "[t]he 'nature of the harm' meant to be targeted by this enhancement is, in part, 'that which results from using someone's identifying information to establish new credit.'" *United States v. Oates*, 427 F.3d 1086, 1090 (8th Cir. 2005) (quoting *United States v. Williams*, 355 F.3d 893, 900 (6th Cir. 2003)).

Given the purpose of the enhancement, we will not read the Guideline to apply to Hawes' conduct in changing the addresses on his clients' account statements lest we produce absurd or unintended results "demonstrably at odds with the intentions of [the statute's] drafters." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982).  Here, Hawes misused his clients' accounts and abused their trust.  He did not, however, establish new credit or "breed" new forms of identification, as contemplated by Congress and the Sentencing Commission in enacting this enhancement.  Hawes' conduct does not qualify for the two-level enhancement under U.S.S.G. § 2B1.1(b)(9)(C)(i).  We therefore find that the District Court erred in imposing the enhancement.

19

**B.     Harmless Error Analysis and Guideline Calculation**

The government urges us to hold that the erroneous application of the identity theft enhancement to the calculation of Hawes' Guidelines Range was harmless. Our recent decision in *United States v. Langford*, 516 F.3d 205 (3d Cir. 2008), controls our analysis of this issue.[6] For us to uphold Hawes' sentence, "it must be clear that the error did not affect the district court's selection of the sentence imposed." *Id.* at 215. As the party defending the sentence imposed, the government bears the burden of "persuad[ing] the court of appeals that the district court would have imposed the same sentence absent the erroneous factor." *Williams v. United States*, 503 U.S. 193, 203 (1992).

In the present case, based on the identity theft enhancement, the District Court calculated the total offense level to be 27, instead of 25, which resulted in a Guideline Range of 70 to 87 months' imprisonment, rather than 57 to 71 months. The Court acknowledged that the advisory Guideline range of 70 to 87 months was the starting point for any sentence she would impose. The judge indicated her belief that "a

---

[6]Although the error at issue in *Langford* concerned a miscalculation of the criminal history level rather than the offense level, there is no reason to treat one type of miscalculation of the Guidelines differently from another. Regardless of the nature of the error, it may affect the Guideline range chosen and the sentence ultimately imposed.

sentence within the advisory guideline range does appropriately concern and address all of the concerns of sentencing" and stated her intention to "sentence within that range." App. 411. On the basis of its evaluation of the § 3553(a) factors, the Court then imposed a sentence of 76 months in the middle to low end of the advisory Guidelines range it had calculated.[7]

The government has not met its burden of showing that the error was harmless. It is by no means "unambiguous" that Hawes' sentence would be the same regardless of whether the identity theft enhancement applied. *See Langford*, 516 F.3d at 217. It is clear from the record that the sentencing court intended to and did in fact select Hawes' sentence from the calculated range. Hawes' sentence was in the mid- to low- point of the calculated range. Because the enhancement was erroneously applied, the Court imposed a sentence outside the proper Guideline range of 57 to 71 months. In order to impose a 76-month sentence, the Court would have had to depart upward from the Guidelines, reasoning through the § 3553(a) factors and explaining why the defendant merited a greater term

---

[7] In *Langford*, we noted the possibility that, based on a miscalculation, a District Court might compare a defendant to others who actually have higher offense levels. That possibility became a reality here, as the District Court indicated that the sentence she imposed avoided "impos[ing] a sentence that would result in disparities among other people who have engaged in like conduct." However, given the proper range, the sentence she imposed resulted in the disparity she was seeking to avoid.

21

of imprisonment than that contemplated by the Guidelines. Here, by contrast, the Court made clear that a within-Guidelines range was appropriate for Hawes based on its § 3553(a) analysis.

The miscalculation of the Guideline range by the District Court also affected the arguments that the parties made at sentencing. After the Court decided that the enhancement would apply and the range would be 70 to 87 months, defense counsel argued for a sentence at the bottom of the Guidelines, that is, a 70-month sentence. Under the correct range, counsel would have urged the Court to impose a 57-month sentence instead.

Because the error was not harmless, we will remand to the District Court for resentencing in light of the foregoing.

## C. Hawes' remaining objections to his sentence

Because we will remand for resentencing, we must address the other errors that Hawes alleges were committed by the District Court in calculating his Guideline range.

### 1. Vulnerable victim enhancement

Hawes challenges the District Court's decision to impose a two-level enhancement under U.S.S.G. § 3A1.1(b)(1), which provides for such enhancement "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim...." A vulnerable victim "means a person (A) who is a victim of the offense of conviction and any conduct for which

the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b)(1), Application Note 2.

Hawes argues that the District Court failed to comply with our decision in *United States v. Iannone*, 184 F.3d 214 (3d Cir. 1999). In *Iannone*, we set forth a three-factor test to determine whether conduct merits the application of the vulnerable victim enhancement:

> (1) the victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability or susceptibility facilitated the defendant's crime in some manner; that is, there was "a nexus between the victim's vulnerability and the crime's ultimate success."

184 F.3d at 220 (quoting *United States v. Monostra*, 125 F.3d 183, 190 (3d Cir. 1997). In particular, Hawes argues that the District Court failed to find that there was "a nexus between the victim's vulnerability" and the success of his fraudulent scheme.

The District Court did not cite *Iannone* in finding that the vulnerable victim enhancement applied. Its failure to use the case name during sentencing in open court does not, however, indicate that the application of the enhancement was error.

Indeed, the record supports the District Court's finding

23

that Hawes' offense qualified for this enhancement. First, the victims of Hawes' fraud met the standard for vulnerability. The District Court referred to the victims' impact statements and "the close personal relationship the Defendant has had with some of his clients, not only his parents, who could not be more susceptible, but also to other clients who he personally knew or who were referred to him by friends and relatives." App. 402. It also found that "many of these individuals were retired, elderly, some suffering from diseases." App. 403. Second, Hawes knew of his victims' vulnerability. Many of his clients were known to him personally or referred to him by friends or relatives. As regards one of his victims, Dorothy McKinney, Hawes knew that she was in a nursing home suffering from Alzheimer's and was legally blind. Third, there was a nexus between the vulnerability of the victims and the continued success of his fraud. The vulnerable status of Ms. McKinney in particular made it easier to continue the fraud. Specifically, when Hawes' mother discovered that Hawes had stolen hundreds of thousands of dollars and demanded that he repay $125,000 immediately, Hawes procured the bulk of this sum from Ms. McKinney's account, knowing that her particular vulnerabilities made it more likely the theft would go undetected. Taking this money to pay his mother was meant to prevent his family from reporting the theft and allow it to continue.

We, therefore, find that the District Court did not err in enhancing Hawes' offense level under § 3A1.1(b) and affirm its application of the vulnerable victim enhancement.

**2. Failure to consider 18 U.S.C. § 3663 in entering the**

24

**restitution order**

Hawes contends that the District Court failed to consider "the financial resources of the defendant, the financial needs and earning ability of the defendant, and the defendant's dependents, and such other factors as the court deems appropriate" as required by 18 U.S.C. § 3663(a)(1)(B)(i)(II). The parties agree that Hawes failed to raise this objection at sentencing. We, therefore, review the order of restitution for plain error. Fed. R. Crim. P. 52(b); *United States v. Lloyd*, 469 F.3d 319, 320 (3d Cir. 2006).

We find no plain error on the record here. Hawes entered into a plea agreement with the government pursuant to which the parties agreed to the amount of loss and restitution. The Second Addendum to the Presentence Report included a spreadsheet reflecting the agreed-to amounts and was adopted by the District Court when it issued the restitution order. During the sentencing hearing, the Court was informed that, with the exception of two victims, the parties had "agreed to what the restitution is and ... agreed to what the amount of loss attributable to each victim is." App. 370. Hawes' current or future ability to pay restitution was never before the District Court. Although the Court was not required to accept the parties' agreement as to restitution, the Court committed no plain error in accepting it. We will therefore affirm the order of restitution.

### 3. Reasonableness of Hawes' sentence

Hawes also argues that his sentence was unreasonable

25

because the District Court gave presumptive weight to the guidelines and imposed a sentence greater than necessary to meet the purposes of sentencing. Because we find that the miscalculation of the Guideline range was not harmless error, we cannot review the sentence for reasonableness. *See Langford*, 516 F.3d at 214-15, 220. We are confident that the District Court will not give presumptive weight to the Guidelines on remand as the Supreme Court has recently made clear that this is error. *Gall v. United States,* 128 S. Ct. 586, 597 (2007).

### III. CONCLUSION

For the foregoing reasons, we will vacate Hawes' sentence and remand to the District Court for resentencing.

Weis, J., Circuit Judge, Concurring.

I agree that the identification enhancement should not have been factored into the Guidelines calculation.

The Guidelines are advisory, not mandatory, and an error in the Guidelines computation may be neutralized by the overarching scrutiny required by the sentencing court's application of 18 U.S.C. § 3553(a).

The sentence here is substantively reasonable. The

26

District Court set out in detail the factors that affected the sentence. In her remarks from the bench at the hearing, the judge said, in part,

> "The law requires that I impose a sentence that is sufficient to but not greater than necessary to fulfill the purpose of sentencing. . . .
>
> First of all, the nature and seriousness of the offense. Quite frankly, the offense is awful. It's awful. To ruin peoples' lives, to be held in trust and to betray. These are serious offenses. . . .
>
> [T]his is a very serious offense, and just punishment is required under the law. Because you have done such a terrible thing to so many people you have to be deterred and others have to be deterred who might consider engaging in like conduct. There is a need to be protected from any additional crimes that you might commit and to do that it is my belief that you should be provided with correctional treatment that can most effectively help you to understand what it is that you have done and what the repercussions and consequences are.
>
> The starting point for any sentence . . . is the advisory guideline range which I have indicated to you is a level 27, category 1, 70-87 months."

It is obvious that the district judge intended to impose a substantial sentence. She then explained, "I believe that a sentence within the advisory guideline range does appropriately concern and address all of the concerns of sentencing that I have mentioned this afternoon."

In my view, our ruling that the Guidelines calculation was erroneous has created substantial uncertainty over the District Court's intent in sentencing defendant. If the judge believed, after performing the overall review, that under § 3553(a) a sentence of 76 months was the appropriate punishment regardless of whether that number came within the Guidelines range, the sentence should be affirmed. On the other hand, if the judge believed that the appropriate sentence must be within the correct Guidelines range, whatever that may be, and did not mean to deviate from it, precedents of this Court would seem to require a remand.

The District Court may have believed that the appropriate sentence under § 3553(a) was a term of 76-months imprisonment and, coincidentally, concluded that the figure was within the erroneous Guidelines computation. The record is ambiguous on this point.

Because they can override the advisory Guidelines, district judges should carefully articulate their rationale in arriving at a sentence under the § 3553(a) calculus in order to avoid unnecessary resentencing.

28

Because on the record before us I am unable to determine the sentencing judge's intention, I join in the order to remand.[8]

---

[8]I disassociate myself from the citations to non precedential opinions. Our Internal Operating Procedures (I.O.P.) 5.7 provides, "[t]he court by tradition does not cite to its not precedential opinions as authority. Such opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing." That same policy applies to panel decisions of other courts which have not been recognized as authoritative by the authoring court.