**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-4895
_____

UNITED STATES OF AMERICA

v.

TERRANCE WILLIAMS a/k/a Sleazy T

Terrance Williams,
                                    Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Crim. No. 05-CR-00443-003)
District Judge:  Honorable Yvette Kane
_____

Argued:  May 4, 2011
_____

Before: BARRY, HARDIMAN and NYGAARD, <u>Circuit Judges</u>

(Opinion Filed: May 23, 2011)
_____

Timothy J. O'Connell, Esq. (Argued)
Turner & O'Connell
4701 North Front Street
Harrisburg, PA 17110-0000

<u>Counsel for Appellant</u>

Theodore B. Smith, III, Esq. (Argued)
Executive Office of the United States Attorney
Evaluation & Review Staff
600 E Street, N.W.
Suite 8500, Bicentennial Building
Washington, DC 20530
        -And-
Daryl F. Bloom, Esq.
James T. Clancy, Esq.
Gordon A.D. Zubrod, Esq.
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108-0000

Counsel for Appellee

_____

OPINION
_____

BARRY, Circuit Judge

Terrance Williams appeals his four-count conviction and subsequent 540-month prison sentence arising from his role as a pimp in a multi-state prostitution ring. We will affirm the convictions, but will vacate the sentences on two counts and remand for resentencing on a third.

## I. Background

Williams was convicted by a jury in October 2007 of: (1) conspiracy to transport, coerce and entice women to travel interstate for prostitution, and to engage in interstate travel in aid of racketeering, in violation of 18 U.S.C. §§ 371, 1952, 2421, & 2422(a)

(Count One); (2) interstate travel in aid of racketeering, in violation of § 1952 (Count Two); (3) sex trafficking, in violation of § 1591 (Count Eight); and (4) transport of a minor for prostitution, in violation of § 2423(a) (Count Ten).

The evidence adduced at trial consisted of the testimony of several prostitutes and of co-conspirators Wayne Banks and Derek Maes, as well as wiretaps, documents, and law enforcement surveillance records indicating that Williams and his fifteen co-conspirators managed a multi-year, multi-state prostitution ring involving up to 150 adolescent girls and young women. Banks described the "pimp partners" as "professional[s] in managing prostitutes." To recruit prostitutes, they became "master[s] of seduction[,] … sell[ing] the dream … of fame, fortune" to adolescent girls and women with children or needy family members who, it was promised, "would be tooken [sic] care of," as well as "girls that … kind of are lost a little bit, … didn't have nowhere to go." The aim was the prostitutes' "dependen[ce]" – their "100 percent relian[ce]," on their pimps. Accordingly, they had to follow a pimp's rules, which essentially reduced to subservient behavior, limited freedom, isolation from family and others outside the pimp-prostitute role, and payment of all their earnings to their pimp. Violations of this protocol resulted in fierce verbal correction, or, worse, in brutal physical violence – "get[ting] beaten up. It was nonnegotiable."

Banks testified that the pimp partners' "affiliation" entailed an "unwritten code," a "tit for tat … an exchange," of mutual counsel, protection, information-sharing, and

3

financial assistance called a "pimp jug." He and Maes described the partners' "meeting of the minds," such that even competition among themselves conformed to unwritten but well-understood rules, while both men also identified Williams as a pimp partner. Maes extensively described Williams's activities with numerous prostitutes, including those he knew were juveniles, as well as his brutality towards them. He also identified at least five pimps with whom Williams "generally associate[d]," testifying that Robert Scott, Jr. was a young pimp whose "career" Williams "helped [to] get … going."

J.K., recruited by the pimp partners in 2004 when she was 16, also implicated Williams in specific conduct supporting his convictions.[1] Williams knew J.K.'s age when he brought her from Harrisburg to Toldeo, where he had sex with her the night she "chose up" with him (i.e., he became her pimp), told her that he loved her, and then transported her from Toledo to Atlanta, on to Kissimee, Florida, and back to Harrisburg – all, as she understood it, for prostitution. While Williams insists that he did not prostitute J.K. – rather, he argues, he was just her companion – when she was asked if, once in Florida

---

[1] J.K. was hit by Williams, and observed other prostitutes working for the pimp partnership being abused when they broke rules, including one who was hit in the face and stomach while she was pregnant, and another whose clothes were ripped off, after which she was thrown out of a motel room into the snow. Audio recordings corroborated allegations of Williams's extreme violence against his prostitutes – e.g., "slamming [a woman's] head against the window" – while R.H., who sought to leave Williams on several occasions, only to be encouraged back, was viciously beaten by him when she had sex with another pimp, and then was prevented from going to the hospital. She did not tell Williams or other pimps of her plans to leave "[b]ecause they wouldn't let me leave if I told them I was leaving."

working for an escort service, she was "engaging in sexual acts," she answered "yes."[2]

Williams's association with J.K. did not end there, however. Once J.K. attracted law enforcement attention, he and Banks played a central role in efforts by several of the pimps to pay J.K.'s mother to help prevent J.K. from testifying against Banks. Williams paid for her transportation from Florida to Toledo, then took her back to Harrisburg (where he insisted that she "work" – i.e., prostitute herself), and otherwise played the role of "middleman" to obstruct her contact with law enforcement. Moreover, a one-time cellmate of Williams later testified that Williams recruited him and his girlfriend as intermediaries to send J.K. a letter in which Williams promised his love to J.K. and sought to prevent her from implicating him in prostituting her.

Following Williams's conviction, a Presentence Report ("PSR") was prepared. The District Court ruled on Williams's various objections to the PSR, and sentenced him to 540 months' imprisonment: 60 months each for Counts One and Two, 540 months for Count Eight, and 360 months for Count Ten, all to run concurrently. Williams timely appealed.

## II. Discussion

The District Court exercised jurisdiction pursuant to 18 U.S.C. § 3231. We exercise jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

Williams raises fourteen issues on appeal, many of which overlap, and all of which

---

[2] Although J.K. confirmed that in some statements she had denied Williams was a pimp, she explained that she had done so because she "was scared," and confirmed that

we have considered with due care.  We discuss only those issues that present threshold questions and those that have arguable merit.

## A.  Challenges to Conviction

We exercise plenary review of legal determinations, "but when the sufficiency of the evidence is challenged, we review the record to determine if there was substantial evidence to support the verdict."  *United States v. Omoruyi*, 260 F.3d 291, 294 (3d Cir. 2001).  Thus we view the evidence in the light most favorable to the government and in a manner that is deferential towards the jury verdict.  *United States v. Rosario*, 118 F.3d 160, 162-63 (3d Cir. 1997).  Were issues not presented to the District Court, we "should correct a plain forfeited error affecting substantial rights if the error seriously affects the fairness, integrity or public reputation of judicial proceedings."  *United States v. Olano*, 507 U.S. 725, 736 (1993) (alteration and quotation omitted).

We begin with Williams's conviction for conspiracy (Count One), the underlying facts of which are relevant to a number of the issues before us.  We observed in *United States v. Rigas*, 605 F.3d 194, 206 n.9. (3d Cir. 2010), that the government must show

> (1) an agreement to commit an offense proscribed by federal law; (2) the defendants intentionally joining in the agreement; (3) one of the conspirators committing an overt act; and (4) an overt act in furtherance of the conspiracy.

Indeed, longstanding case law has established as "elementary" the proposition "that an unlawful conspiracy may be and often is formed without simultaneous action," *Interstate*

when he transported her across state lines for prostitution, she "didn't have any choice."

6

*Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939), and in the absence of "an express agreement." *United States v. Paramount Pictures*, 334 U.S. 131, 142 (1948).

We reject Williams's argument that the government failed to prove the charged conspiracy because it did not prove a unity of purpose or a common goal, revenue sharing, or an authority structure; indeed, there was extensive evidence that Williams and his partners had a "meeting of the minds" and coordinated their "enterprise's" activities, pricing, and rules. Moreover, Maes's and Williams's plan – with Williams serving as a "middleman" – to keep J.K. from testifying, lest she "caus[e] a domino effect on all the pimps," speaks precisely to a unitary conspiracy, while the consistency with which testifying witnesses described the pimps *as partners*, who shared a common "code" and favored one another with a "pimp jug" when necessary, speaks to much more than a confluence of personal affinity and economic fortuity. To prove conspiracy, "[i]t is enough that a concert of action is contemplated and that the defendants conformed to the arrangement." *Paramount Pictures*, 334 U.S. at 142. There was ample evidence that Williams and his partners conformed to an arrangement to transport, coerce, and entice adolescent girls and young women for prostitution.

Williams's sufficiency challenge to his Mann Act conviction (Count Ten) also fails. One "who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce … *with intent* that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal

7

offense," violates the Mann Act, 18 U.S.C. § 2423(a) (emphasis added). Ruling on a different section of the Act, the Supreme Court reversed a conviction because there was insufficient evidence

> that [an] interstate vacation trip, or any part of it, was undertaken by petitioners for the purpose of, or as a means of effecting or facilitating, [prostitution] activities. The sole purpose of the journey from beginning to end was to provide innocent recreation and a holiday for petitioners and the two girls. . . . What Congress has outlawed by the Mann Act … is the use of interstate commerce as a calculated means for effectuating sexual immorality.

*Mortensen v. United States*, 322 U.S. 369, 375 (1944). Thus the focus is on *intent* – the focus of the statute's present terminology – and not necessarily on the accomplishment of a specific act. *See United States v. Hamilton*, 456 F.2d 171, 173 (3d Cir. 1972) (observing that § 2423 requires "proof that one knowingly transports or persuades, induces, entices or coerces"); *United States v. Cole*, 262 F.3d 704, 708 (8th Cir. 2001) (citing *Mortensen*, and holding that "[w]hether [defendant] intended to have sex with [a minor] *in Florida* when he transported her out of Arkansas is irrelevant." (emphasis added)).

Nevertheless, Williams asserts that transporting J.K. to Toledo, where she "chose up" with him, slept with him (i.e., rather than with a paying customer), and then gathered clothing and other effects from another of his prostitutes, was insufficient for conviction. His argument fails, however, because it reads the statute as requiring that prostitution per se occurred at the destination. Here, there was evidence that, among other things, J.K.

8

knew when she "chose-up" with Williams that he was a pimp who would prostitute her, and in fact she *was* prostituted, even if after the Toledo trip. In no sense was Williams's transport of J.K. a vacation, à la *Mortensen*, and more than sufficient evidence permitted the jury to conclude that he possessed the requisite intent for conviction – i.e., the "calculated means for effectuating" J.K.'s prostitution. *Mortensen*, 322 U.S. at 375.

At the time of Williams's offense, 18 U.S.C. § 1591(a)(1) & (c)(1) (Count Eight) proscribed, in relevant part, the knowing recruitment, enticement, or transport of a person,

> knowing that force, fraud, or coercion … will be used to cause the person to engage in a commercial sex act, *or* that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, … [which is defined as] any sex act, on account of which anything of value is given to or received by any person.

*Id.* (emphasis added).[3] Although Williams again argues evidentiary insufficiency, his arguments reduce to disappointment with inferences that the jury reached, arguments that simply cannot carry the day given our deferential standard of review. Moreover: (1) liability under the statute does not require that J.K. engaged in a commercial sex act *with him*; (2) while it was arguably unclear what J.K. did in Florida, there was sufficient evidence that she, in fact, engaged in sexual acts; and (3) his defense that, whatever she did, she did of her own volition, is belied by her age, by the fact that when he first transported her she had nothing with her and was sick, and by her express testimony that

---

[3] As relevant to several issues raised on appeal, the superseding indictment, which the verdict slip incorporated by reference, alleged the elements of § 1591 in the conjunctive.

9

she felt scared and had no other choice.[4]  We likewise reject Williams's variance

argument, for § 1591 does not require additional proof that later, specific acts occurred

that Williams expressly intended.  J.K., whom the District Court deemed credible,

testified that he took her from Harrisburg to Toledo, to Florida, and back to Harrisburg to

prostitute herself.  That was sufficient.[5]

### B.  Challenges to sentencing

We apply plenary review to the issue of whether the District Court's application of

the Sentencing Guidelines violated the *ex post facto* clause, *United States v. Brennan*, 326

F.3d 176, 197 (3d Cir. 2003), and to its interpretation of the Guidelines, while we review

factual findings relevant to sentencing enhancements for clear error.  *United States v.*

*Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc).  "Although we generally review jury

---

[4] Williams tries to distinguish between J.K.'s fear of the police and her fear *of him*, but in so doing misses the point that, *whomever* she feared, that fear stemmed from the implications of her involvement in prostitution, which Williams and his partners conspired to effect.

[5] Williams also argues, for the first time on appeal, that the jury instructions did not specify that to convict other than for force, fraud, or coercion, the jury had to find that J.K. was under 18 *and* that he knew she would be caused to engage in a commercial sex act.  He argues this was reversible error because, an essential element of the offense having been omitted, the jury did not necessarily find that he committed the offense charged.  However, even assuming that there was error, a new trial is not warranted because any misstatement by the District Court did not affect the fairness and integrity of the proceedings, given (1) the Court's accurate recitation of the statutory text, (2) the text of the indictment itself, and (3) days of argument and testimony focusing on whether Williams prostituted J.K., rather than whether she just happened to be a prostitute who enjoyed his company.  *See Olano*, 507 U.S. at 736; *United States v. Haywood*, 363 F.3d 200, 207 (3d Cir. 2004) ("In the case of an erroneous jury instruction, the relevant inquiry ... is whether, in light of the evidence presented at trial, the failure to instruct had a prejudicial impact on the jury's deliberations, so that it produced a miscarriage of justice."

instructions for abuse of discretion, our review is plenary when the question is whether [the D]istrict [C]ourt's instructions misstated the law." *United States v. Dobson*, 419 F.3d 231, 236 (3d Cir. 2005) (internal alterations, quotation marks, and citation omitted).

We first address Williams's claims concerning the Sentencing Guidelines. As a threshold matter, the District Court concluded that Williams's base offense level and a four-level increase were warranted pursuant to U.S.S.G. § 2G1.3(c)(3) (Promoting a Commercial Sex Act or Prohibited Sexual Conduct with a Minor), with cross-reference to § 2A3.1 (Criminal Sexual Abuse), for conduct described in 18 U.S.C. §§ 2241 or 2242 (knowingly causing another to engage in a sexual act by force, threats, or placing that "person in fear that any person will be subjected to[, e.g.,] … serious bodily injury."). We reject Williams's arguments that the Court committed clear error in this regard, because there was ample evidence that he enticed J.K., and other prostitutes, with promises of love and "the dream," while enforcing his rules through threats and violence and keeping all of their earnings. On this point, we find compelling the Eleventh Circuit's reasoning that, given such techniques, which are essentially "synonymous" with a pimp's "coercing" a woman "to continue performing sexual services so he could recover the proceeds," there need not be proof that his use of those techniques forced her into particular sex acts on specific occasions. *United States v. Madison*, 477 F.3d 1312, 1317 (11th Cir. 2007).[6]

_____

(quotation omitted)).

[6] We are also unpersuaded by Williams's argument that the cross-reference constituted an *ex post facto* violation in light of *United States v. Bertoli*, 40 F.3d 1384 (3d Cir. 1994). *Bertoli* precludes boot-strapping a count of conviction for offenses completed prior to a

We will also affirm as to the applicability of various sentencing enhancements. First, given the facts that the District Court cited, and in light of the entire record, the Court did not err in applying two, two-level enhancements on the premise that Williams "knew or should have known" that his offense involved "a large number of vulnerable victims," per U.S.S.G. § 3A1.1(b)(1) & (2). In *United States v. Hawes*, 523 F.3d 245, 255 (3d Cir. 2008), we upheld a vulnerable victim enhancement even where the sentencing court failed to cite the applicable legal rule, because the record was deemed to support the court's factual findings.[7] While the Court's analysis here was in some respects brief, it had the benefit of an extensive record, considerable eyewitness

revision of the Sentencing Guidelines to a post-revision count for discrete conduct, thus yielding a higher Guidelines range as to all conduct. *Id.* at 1403. That did not occur here. Williams was convicted of a conspiracy – a continuing offense by definition – spanning many years and concluding after the challenged Guidelines version's effective date. He offered no evidence of renunciation, much less of a minor role, thus rendering him liable for his acts and for all reasonably foreseeable co-conspirator conduct. *See United States v. Rosa*, 891 F.2d 1063, 1068-69 (3d Cir. 1989); *see also* U.S.S.G. § 1B1.3, applic. n.1; *United States v. Sullivan*, 255 F.3d 1256, 1263 (10th Cir. 2001) (for "a continuing offense like conspiracy, the ending date … determines the applicable sentencing guidelines").

[7] *United States v. Iannone* held that the enhancement requires a showing that: (1) the victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability or susceptibility facilitated the defendant's crime in some manner; that is, there was a nexus between the victim's vulnerability and the crime's ultimate success.

184 F.3d 214, 200 (3d Cir. 1999) (quotation omitted). Moreover, noting "that victims can be particularly vulnerable if they are financially insecure, sick, in a state of emergency, or otherwise susceptible to the particular kind of criminal conduct at issue," we have upheld the enhancement despite the argument, akin to Williams's claim here, that a victim's contributory negligence, so to speak, provided the defendant with the "*opportunity* to commit the crime as opposed to *facilitating* it, as required by the third prong of *Iannone*." *United States v. Kennedy*, 554 F.3d 415, 424, 425 (3d Cir. 2009) (citations omitted).

12

testimony, and the government's proposed findings of fact substantiating the enhancements. Moreover, the Court expressly found that J.K. was vulnerable for any number of reasons and, citing Williams's connection to the conspiracy in general, deemed as reasonably foreseeable to him his partners' "exploitation of large numbers of vulnerable victims and juvenile victims for sex trade … [via] the use of force, coercion, threats, and fear."[8] Similarly, the record supports the four-level "organizer or leader" enhancement, per § 3B1.1(a), given the "degree of [Williams's] participation and planning or organizing" of the conspiracy, *United States v. Barrie*, 267 F.3d 220, 223 (3d Cir. 2001) (quotation omitted), as well as the obstruction of justice enhancement, per § 3C1.1.[9]

Although the District Court did not clearly err in applying the Guidelines, it did commit legal error with respect to two aspects of this case, requiring resentencing. First, at the time of Williams's offense, Count Eight subjected him to a sentence of *either*: (1) up to life imprisonment "if the offense was effected by force, fraud, or coercion *or* if the [victim] … had not attained the age of 14"; *or* (2) of no more than 40 years (i.e., 480

---

[8] The pimps purposefully sought "lost girls" and, in some cases, impregnated their recruits to increase their dependence on the pimps, thus permitting the inference that the pimps themselves distinguished between ordinarily vulnerable and particularly vulnerable victims. Applying both enhancements comports with *Iannone*, *Hawes*, and *Kennedy*, and is not blindly premised on assumptions about a certain "class" of women whose lives, in the aggregate, may have been marked by homelessness, economic exigency, addiction, or other characteristics putatively typical of Mann Act victims, as Williams argues.

[9] At sentencing, the Court referenced wiretap evidence attesting to Williams's counsel of and planning with multiple co-conspirators, and the fact that he trained Robert Scott,

13

months) "*if the offense was not so effected* [i.e., by force, fraud, or coercion], *and* the" victim was at least 14 years old but under the age of 18. 18 U.S.C. § 1591(b) (emphasis added). At sentencing, the Court applied the former range on the premise that, although J.K. was 16 at the time of the offense, the jury had found force, fraud, or coercion.

Williams recapitulates his argument, raised at sentencing, that the verdict slip and jury instructions elided the Fifth and Sixth Amendments' requirement that distinct offense elements affecting the potential maximum penalty be expressly charged by indictment and found by the jury beyond a reasonable doubt. *See Jones v. United States*, 526 U.S. 227, 243 n.6 (1999); *United States v. Grier*, 475 F.3d 556, 561-64 (3d Cir. 2007) (en banc) (summarizing *Jones* and the related precedents set forth in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004)). Although the District Court acknowledged what it characterized as Williams's "*Apprendi* argument," it erred by not recognizing that its rule – or, rather, that of *Jones* through *Apprendi* and *Blakely* – had not been satisfied. As Williams accurately contends, while the Court stated *at sentencing* that the jury had been asked to find by special interrogatory either that a child under 14 was involved or that Williams sex-trafficked J.K. by force, fraud, or coercion, in fact the verdict slip only asked the jury to find, under Count Eight, whether he was guilty of "Sex Trafficking of Children or by Force, Fraud, or Coercion." Thus, although the Court's instructions accurately set forth the statute's offense requirements per 18 U.S.C. §

Jr. That, plus Williams's "middleman" role with five co-conspirators and J.K.'s mother to prevent J.K. from testifying, supported both enhancements.

1591(a), its failure to require the jury to find the differently-framed elements controlling the subsequent penalty, as set forth in subsection (b), may well mean that it concluded no more than that Count Eight was proven because J.K. was under 18.

We find the government's harmless error argument unpersuasive. In point of fact, the manifest inconsistency between the statutory language, the verdict slip, the indictment (incorporated by reference into the former), and the District Court's instructions to the jury make it impossible to ensure that the jury did not determine that Williams was guilty of an offense that could merit only up to 40 years' imprisonment. Because his subsequent *45*-year sentence affects Williams's substantial rights, we will exercise our discretion to vacate the sentence as to Count Eight and remand for resentencing.

Finally, the District Court accepted Williams's argument that Counts Two, Eight, and Ten merged for purposes of sentencing, *see Pandelli v. United States*, 635 F.2d 533 (6th Cir. 1980) (holding that Travel Act and Mann Act offenses merge for double jeopardy purposes), but then imposed separate sentences on each count. The government concedes that, under *Ball v. United States*, 470 U.S. 856 (1985), and *United States v. Miller*, 527 F.3d 54 (3d Cir. 2008), this violated the double jeopardy prohibition, even if not effectively resulting in longer imprisonment because the sentences were ordered to run concurrently. We will thus vacate the sentences imposed as to Counts Two and Ten.

### III. Conclusion

For the foregoing reasons, and finding Williams's remaining arguments to be

15

without merit, we will affirm his conviction on all counts, and will affirm the District Court's application of the Sentencing Guidelines and its judgment of sentence as to Count One. We will, however, vacate the judgment of sentence on Counts Two and Ten, and remand for the imposition of a sentence on Count Eight that shall not exceed 40 years.